1          IN THE UNITED STATES DISTRICT COURT
      FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
2

3  UNITED STATES OF AMERICA,      Criminal Action
                                  No.  1:23MJ262
4        Plaintiff,                    1:23CR231

5  vs.                            Durham, North Carolina
                                  June 26, 2023
6  MARIAN HUDAK,
         Defendant.
7  _____/

8

9      **TRANSCRIPT PREPARED FROM AN AUDIO RECORDING**

10  TRANSCRIPT OF PRELIMINARY EXAMINATION and DETENTION
                  HEARING PROCEEDINGS
11        BEFORE THE HONORABLE JOE L. WEBSTER
         UNITED STATES MAGISTRATE DISTRICT JUDGE
12

13  APPEARANCES:

14  For the Government:   JOANNA G. McFADDEN, AUSA
                          Office of U.S. Attorney
15                        101 S. Edgeworth Street
                          Fourth Floor
16                        Greensboro, North Carolina 27402

17
    For the Defendant:    LISA S. COSTNER, AFPD
18                        Office of Federal Public Defender
                          301 North Elm Street
19                        Suite 410
                          Greensboro, North Carolina 27401
20

21

22

23

24

25     Proceedings reported by stenotype reporter.
    Transcript produced by computer-aided transcription.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 1 of 126

1 **I N D E X**

2

**GOVERNMENT WITNESS:**

3

Special Agent Emily Franks

4

    By Ms. McFadden         4

5

    By Ms. Costner          30

6

7 **DEFENSE WITNESS:**

8 Ingrid Hudak

9     By Ms. Costner       68, 82, 88

10     By Ms. McFadden     79

11

12 **E X H I B I T S**

13

14 Government's 1 - 29          65

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES vs. MARIAN HUDAK  1:23CR231
Preliminary Examination & Detention 6/26/23

```
 1              P R O C E E D I N G S

 2          (THE FOLLOWING TRANSCRIPT WAS TAKEN

 3   FROM AN AUDIO RECORDING.)

 4          MS. McFADDEN:  Your Honor, the next matter

 5      is United States versus Marian Hudak,

 6      1:20MJ262-1.  Mr. Hudak is present.  He's

 7      represented by Ms. Costner.  The matter has

 8      been calendared for a preliminary examination

 9      hearing and a detention hearing.

10          THE COURT:  All right.  Are you ready to

11      proceed with the detention hearing,

12      Ms. Costner?

13          MS. COSTNER:  Yes, Your Honor, we are

14      prepared to proceed with both.

15          THE COURT:  Good morning to you.  Good

16      morning, Mr. Hudak.

17          THE DEFENDANT:  Good morning.

18          THE COURT:  All right.  You can call your

19      witness.

20          MS. McFADDEN:  Thank you, Your Honor.  The

21      United States Emily Franks.

22          (SPECIAL AGENT EMILY FRANKS, GOVERNMENT

23      WITNESS, WAS SWORN.)

24

25
```

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 3 of 126

**DIRECT EXAMINATION**

**BY MS. McFADDEN:**

1      **Q**   Good morning, Ma'am.  Would you just state
2  your name and spell your last name for the record.

3      **A**   Good morning.  Yes, my name is Agent Emily
4  Franks.  F-R-A-N-K-S?

5      **Q**   And, Ms. Franks, how are you employed?

6      **A**   I'm an agent with the FBI, based out of
7  Charlotte.

8      **Q**   How long have you been with the FBI?

9      **A**   I've been with the FBI as an agent since
10  January of 2019, and then with the agency in
11  different positions prior to that.

12      **Q**   Are you currently assigned to a particular
13  squad?

14      **A**   I am.  Currently I'm assigned to the Civil
15  Rights Public Corruption Squad out of Charlotte.

16      **Q**   And so you may have alluded to this in the
17  squad name, but what types of cases do you
18  investigate typically?

19      **A**   I primarily investigate civil rights
20  cases.

21      **Q**   Special Agent Franks, are you familiar
22  with the defendant in this case, Mr. Hudak?

23      **A**   I am.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1      **Q**    How did he first come to the attention of
2  the FBI?

3      **A**    He first came to the attention of the FBI
4  back in March of 2020.  It came as a tip from the
5  Concord Police Department.  They had encountered
6  Mr. Hudak.  In those encounters, he was -- he had
7  burned a couple of flags.  He made some comments
8  about going to Seria, and he had been found with
9  multiple weapons, including tac vests, hasp baton,
10 and brass knuckles.

11     **Q**    And did the FBI later receive a tip from a
12 victim identified by her initials as A.R., regarding
13 an incident that occurred on October 13th, 2022?

14     **A**    Yes, Ma'am.  In October of this year we
15 received a tip to the National Operations Center,
16 which was then routed to our office, from A.R.

17     **Q**    Did the FBI interview A.R. as a result of
18 that?

19     **A**    We did.

20     **Q**    Did the FBI also interview an individual
21 identified as J.S. related to that tip?

22     **A**    Yes.

23     **Q**    Did the FBI obtain surveillance footage
24 from areas relevant to the incident that was
25 described?

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1    **A**    We did.

2    **Q**    What did the FBI learn about what occurred

3 on October 13, 2022, in Concord, North Carolina?

4    **A**    On October 13th, at around 3:20, J.S. was

5 driving on Concord Parkway South.  In front of him

6 was Mr. Hudak.  J.S. recognized his truck as a the

7 truck that he had seen around town before, just

8 because it had a couple of flags on it, including

9 the Confederate flag, as well as stickers and some

10 writings.

11          J.S. was initially startled when he

12 saw the truck, but eventually, traffic caused him to

13 get close.  When J.S. and Mr. Hudak were driving

14 next to each other, J.S. and Mr. Hudak made eye

15 contact, and Mr. Hudak yelled -- he yelled the N

16 word and, "Come here, boy."

17    **Q**    Did J.S. notice anything in the window of

18 Mr. Hudak's truck at the time?

19    **A**    He did.  He noticed that there was some

20 knives jammed into the open driver's side window of

21 the car.

22    **Q**    And this was on Concord Parkway South, is

23 that correct?

24    **A**    Yes, Ma'am.

25    **Q**    And that's a facility provided and

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 6 of 126

1  administered by the State of North Carolina, is that

2  right?

3      **A**    Yes.

4      **Q**    Now after J.S. and Mr. Hudak first

5  encountered one another, what did Mr. Hudak do next?

6      **A**    So J.S. attempted to drive away.

7  Mr. Hudak then -- he noticed that Mr. Hudak was

8  following him in his rearview.  Mr. Hudak then

9  pulled around J.S.'s car, impeding his driving

10  ability, and Mr. Hudak then got out of the car and

11  banged on J.S.'s window.  He pointed his finger and

12  said, "Come here," N word, and, "Hey, come here."

13      **Q**    And did J.S. feel threatened enough to

14  reach for a pistol that he had in his car?

15      **A**    He did.

16      **Q**    Did Mr. Hudak then get back into his

17  truck?

18      **A**    He did.

19      **Q**    Did he follow J.S. back to his apartment

20  complex in Concord?

21      **A**    Yes, he did.

22      **Q**    What, if anything, did J.S. do while

23  Mr. Hudak was pursuing him in his truck?

24      **A**    While Mr. Hudak was pursuing him, J.S.

25  called his girlfriend, A.R., on the phone, and told

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 7 of 126

1   her to call 911, the guy with the truck with the

2   rebel flags was following him, and also to bring his

3   rifle downstairs.

4       **Q**   And was A.R. at their shared residence at

5   that time?

6       **A**   She was.

7       **Q**   Was she there with her small child?

8       **A**   She was.

9       **Q**   Did she call 911?

10      **A**   She did.

11      **Q**   And then what did she do?  Did she leave

12  the apartment?

13      **A**   She left the apartment and brought the

14  rifle out to the parking lot to J.S.

15      **Q**   And so when she was out there, what did

16  she see?

17      **A**   So she ran out in the parking lot and gave

18  him his rifle.  At that point, she saw Mr. Hudak

19  pull into the parking lot, followed by an

20  unidentified person in a black Cadillac.

21      **Q**   And how did Mr. Hudak and the unidentified

22  person position their vehicles?

23      **A**   They pulled into the apartment parking lot

24  and positioned their vehicles to block both the

25  entrance and the exit of the parking lot.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 8 of 126

1     **Q**     Did surveillance footage from the

2 apartment complex capture this event?

3     **A**     It did.

4          **MS. McFADDEN:**  Your Honor, may I approach?

5          **THE COURT:**  You may.

6 **BY MS. McFADDEN:**

7     **Q**     Special Agent Franks, I'm handing you what

8 is marked for identification as Government's

9 Exhibits 1 through 29.  I've previously provided a

10 copy of these to Ms. Costner, as well as to the

11 Court.

12          If you could take a look at

13 Government's Exhibit 1, and let me know if you

14 recognize that image.

15     **A**     I do.

16     **Q**     What is featured in Government's Exhibit

17 1?

18     **A**     So you see Mr. Hudak's truck parked to the

19 right.  Mr. Hudak is standing in between -- near the

20 black Cadillac, and then the black Cadillac,

21 blocking the entrance and exit to the apartment

22 complex parking lot.

23     **Q**     Did both J.S. and A.R. report that they

24 saw Mr. Hudak with a handgun?

25     **A**     They did.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 9 of 126

1    **Q**    And did they say that Mr. Hudak said

2 something related to having a gun?

3    **A**    He said that he would shoot J.S. and he

4 later said that he was going to shoot A.R.

5    **Q**    Did he yell anything else at J.S. and A.R.

6 at some time?

7    **A**    He did.  He said, "I will kill you," N

8 word.  "I will shoot that black," B word, "I know

9 where you live, and I will be back."

10    **Q**    And after A.R. gave J.S. his rifle, what

11 did she do next?

12    **A**    A.R. got back -- got into J.S.'s car and

13 drove down the parking lot to get out of the

14 situation.

15    **Q**    Did J.S. yell to Mr. Hudak that he had

16 called the police?

17    **A**    He did.

18    **Q**    And did Mr. Hudak leave the parking lot?

19    **A**    Umm, he did, and he -- he did.

20    **Q**    Did he drive along the street running

21 parallel to the parking lot in the direction of

22 where A.R. was at that time?

23    **A**    Yes.

24    **Q**    Could police sirens then be heard?

25    **A**    Yes.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 10 of 126

1     **Q**     And then did Mr. Hudak finally leave the

2 scene?

3     **A**     He did.

4     **Q**     In response to the 911 call, did officers

5 with the Concord Police Department respond to the

6 scene also attempt to find Mr. Hudak?

7     **A**     Yes.

8     **Q**     Did they conduct a traffic stop of him?

9     **A**     They did.

10     **Q**     Did they find any firearms?

11     **A**     They did not.

12     **Q**     Did they perform a thorough search of the

13 truck?

14     **A**     They performed a limited sweep.

15     **Q**     Did one of the officers say on camera,

16 "There is just so much stuff, I don't know," when

17 asked if he had found anything in the truck?

18     **A**     Yes.

19     **Q**     Now directing your attention to

20 Government's Exhibit No. 2, Special Agent Franks, is

21 this a still from a body-worn camera of Mr. Hudak's

22 truck at an earlier date?

23     **A**     Yes.

24     **Q**     Is this a date from July of 2022?

25     **A**     Yes.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 11 of 126

1    **Q**    And what are the items that are jammed
2 into the driver's side window of the truck?
3    **A**    You can see the knives jammed into the
4 window of the truck.
5    **Q**    So was Mr. Hudak arrested related to this
6 incident with J.S. but released on a promise to
7 appear?
8    **A**    Yes, Ma'am.
9    **Q**    Now did the FBI also interview an
10 individual, K.E., a witness who was at the apartment
11 complex when Mr. Hudak arrived?
12    **A**    Yes.
13    **Q**    Was she in her car at the time he arrived?
14    **A**    She was.
15    **Q**    And did she state that she saw Mr. Hudak
16 pointing a small black handgun at J.S.?
17    **A**    She did.
18    **Q**    Did she call 911?
19    **A**    She did.
20    **Q**    Did she tell the dispatcher that
21 Mr. Hudak, "Just followed these black guys out here,
22 and I seen guns and everything?"
23    **A**    Yes.
24    **Q**    Now is K.E. black?
25    **A**    She is.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 12 of 126

1    **Q**    Is A.R. black?

2    **A**    She is.

3    **Q**    Is J.S. black?

4    **A**    Yes.

5    **Q**    And had she encountered Mr. Hudak on prior

6 occasions when he drove up to her and yelled and

7 pointed at her?

8    **A**    She did, on two prior occasions.

9    **Q**    Now through this investigation, did the

10 FBI also learn of incidents involving Mr. Hudak and

11 his neighbors, the Duarte family?

12    **A**    Yes.

13    **Q**    Specifically, what did the FBI learn about

14 an incident that occurred on November 27, 2021?

15    **A**    In regards to that incident, we learned

16 that on November 26th, Mr. Duarte parked in the

17 grass outside of his family's home.  On

18 November 27th, he woke up that morning and noticed

19 that his car had been egged.  He assumed that it was

20 Mr. Hudak, based on where the eggs were on the side

21 of the car.

22        **MS. COSTNER:**  It assumes, Your Honor.

23        **THE COURT:**  I am not going to let her

24      testify to that, unless you have some direct --

25        **MS. McFADDEN:**  Your Honor, I'm only

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 13 of 126

1   eliciting this statement to the FBI regarding

2   his belief of the origin.

3        I'll continue.

4   **BY MS. McFADDEN:**

5   **Q**   Excuse me, Special Agent Franks, please

6   continue as to what happened on the night of

7   November 27th.

8   **A**   On the night of the 27th, around eleven,

9   Mr. Hudak went -- or, I'm sorry, Mr. Duarte was

10  outside about to give a ride home to his friend.

11  Mr. Hudak came out of the house and began yelling at

12  Mr. Duarte about his headlights waking up his

13  daughter.

14        At that point, they argued back and

15  forth.  Mr. Hudak yelled things like, "You F-ing

16  Mexican alcoholics," and told Mr. Duarte to, "go

17  back to your country."

18        At that point, they argued back and

19  forth and Mr. Duarte said something like, "if you

20  want to do something, let's do it."  At that point,

21  Mr. Hudak charged him.  Mr. Hudak swung at

22  Mr. Duarte.  Mr. Duarte avoided the first two or

23  three swings, and then Mr. Hudak hit Duarte in the

24  lip with a closed fist.  Mr. Duarte then returned

25  punches and they continued fighting.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 14 of 126

1           Mr. Duarte then retrieved a shotgun

2 out of the back of his car, pointed it at Mr. Hudak,

3 and then the fight continued.  Mr. Hudak charged at

4 Mr. Duarte, and ultimately Mr. Duarte told Hudak

5 that he needed to leave his yard.

6      **Q**    Now did the Duartes have a

7 motion-activated ring security camera at that time?

8      **A**    They did.

9      **Q**    And did it capture two five-second clips

10 of this encounter?

11      **A**    Yes.

12      **Q**    Was this consistent with Mr. Duarte's

13 recollection of events?

14      **A**    They were.

15      **Q**    Did Mr. Hudak, after he left, continue to

16 say, "Fucking Mexican," and "When I see you again,

17 I'm going to run you off the road and I'm going to

18 kill you," until he went home?

19      **A**    Yes.

20      **Q**    Did Mr. Duarte's mother eventually take

21 out a no-contact order on Mr. Hudak?

22      **A**    She did.

23      **Q**    Did that complaint state that on

24 August 27th, 2022, Mr. Hudak came towards their dog

25 with a bat and verbally attacked her 9 and 13 year

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 15 of 126

1  old daughters?

2     **A**   Yes.

3     **Q**   Did the complaint state that when

4  Ms. Duarte came outside, Mr. Hudak called her, "A

5  fucking Mexican, stupid fat ass bitch," and said

6  that she should, "Go back to Mexico."?

7     **A**   Yes.

8     **Q**   Did Ms. Duarte contact the police after

9  this?

10     **A**   She did.

11     **Q**   Did Mr. Hudak record Ms. Duarte while she

12  was waiting for the bus and did he say, "There she

13  is, that stupid fat ass Mexican bitch."?

14     **A**   Yes.

15     **Q**   Was Mr. Duarte so concerned for his mother

16  and his sisters' safety that he actually moved back

17  home?

18     **A**   He did.

19     **Q**   Now related to these incidents, did the

20  FBI also uncover additional evidence of Mr. Hudak's

21  racial bias?

22     **A**   We did.

23     **Q**   Did they learn that on July 21, 2022,

24  multiple people called the Concord PD to report that

25  he was broadcasting racial slurs over a loud speaker

UNITED STATES vs. MARIAN HUDAK  1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO  Document 21  Filed 07/18/23  Page 16 of 126

1 at a Sam's Club parking lot?

2     **A**    Yes.

3     **Q**    When police arrived, was he yelling, "Fuck

4 the black people," over a loud speaker?

5     **A**    Yes.

6     **Q**    Did the FBI, in the course of

7 investigating this case, also speak with a Concord

8 police officer who actually lived in Mr. Hudak's

9 neighborhood?

10     **A**    Yes.

11     **Q**    Did he once witness Mr. Hudak yelling and

12 cursing at his neighbor, who the officer identified

13 as Hispanic?

14     **A**    Yes.

15     **Q**    Did he recall Mr. Hudak yelling things

16 like, "Go back, you fucking Mexican, we don't want

17 you dirty people."?

18     **A**    Yes.

19     **Q**    And did the officer recall that this

20 Hispanic neighbor's children were actually outside

21 waiting for the school bus at the time that has

22 happened?

23     **A**    Yes.

24     **Q**    Are you familiar with an interaction that

25 Mr. Hudak had with the Concord Police Department on

UNITED STATES vs. MARIAN HUDAK  1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO  Document 21  Filed 07/18/23  Page 17 of 126

1 July 2nd, 2022?

2     **A**   I am.

3     **Q**   Was he arrested for injury to property on

4 that date?

5     **A**   Yes.

6     **Q**   And did at that time he tell the arresting

7 officer, "Black people or Mexican people, oh, my

8 God, you know, some of them they are good, they

9 friendly, but some of them hate you guys. They hate

10 the thin blue line. They hate everything."?

11     **A**   Yes.

12     **Q**   And did he admit to calling someone, "you

13 fucking," N word and explain, "I hate using that

14 word because it is not good, but what can I do."?

15     **A**   Yes.

16     **Q**   And was Mr. Hudak placed on probation in

17 November of 2022 for spitting in a man's face and

18 kicking his car door?

19     **A**   Yes.

20     **Q**   Related to that probationary term, did a

21 state probation officer visit Mr. Hudak's home on

22 December 16th, 2022?

23     **A**   Yes.

24     **Q**   Directing your attention to Government's

25 Exhibit No. 3, do recognize these images?

UNITED STATES vs. MARIAN HUDAK  1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO  Document 21  Filed 07/18/23  Page 18 of 126

1    **A**    Yes.

2    **Q**    Are these items that the probation

3 officer, the state probation officer noted in

4 Mr. Hudak's home in that home visit?

5    **A**    Yes.

6    **Q**    What is the flag on the far left corner?

7    **A**    From the far left corner we have a flag

8 that has the swastika flag or Nazi flag.

9    **Q**    What is the flag in the far right corner?

10    **A**    The far right corner is a KKK flag with a

11 blood drop cross, or iron cross on it.

12    **Q**    And then what is the object in the bottom

13 picture there?

14    **A**    It is a ring, like a skull shape with an

15 iron cross.

16    **Q**    Do you have any other understanding based

17 on your work in the civil rights unit, of the

18 significance, if any, of the emblem?

19    **A**    I do.  I understand that is an iron cross,

20 which was the German military symbol or medal back

21 in World War I and World War II.  I know now that it

22 typically is associated with white supremacist

23 beliefs.

24    **Q**    And since the incident with Mr. Hudak and

25 J.S., has he since posted racially inflammatory

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1 things on social media?

2     **A**    He has.

3     **Q**    Turning your attention to Government's

4 Exhibit No. 4, is this a posting that Mr. Hudak made

5 to his publicly available Facebook account on

6 January 9th, 2023?

7     **A**    Yes.

8     **Q**    What are the comments underneath the

9 photograph?

10     **A**    "Idiots from Mexico in my neighborhood,"

11 and then, "illegal immigrants."

12     **Q**    And what account is associated with those

13 comments?

14     **A**    Marian Hudak.

15     **Q**    Turning to Government's Exhibit No. 5, do

16 you recognize this as a screen-shot of a posting

17 taken from Mr. Hudak's Facebook account?

18     **A**    I do.

19     **Q**    What are the words that are written there?

20     **A**    It says, "Mexican idiot asking for trouble

21 every single day."

22     **Q**    Is the lawn picture here the same one that

23 is pictured in Government's Exhibit 4?

24     **A**    It is.

25     **Q**    Showing you now Government's Exhibit No.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 20 of 126

1 6, is this a posting made to Mr. Hudak's Facebook

2 account on January 10th, 2023?

3     **A**    Yes.

4     **Q**    What is the comment underneath the images

5 there?

6     **A**    It has, "Mexican cartel and domestic

7 terrorist organizations in Concord, North Carolina.

8 Hate American flag and American people.  Shame on

9 you, pay dirty money for walking free."

10     **Q**    And what account made that comment?

11     **A**    Marian Hudak.

12     **Q**    Turning your attention to Government's

13 Exhibit No. 7, is this a posting made to Mr. Hudak's

14 Facebook account on January 25th, 2023?

15     **A**    It is.

16     **Q**    And what are the comments that are

17 underneath the image here?

18     **A**    It says, "I remember this because Mexican

19 cartel and weed dealers in my neighborhood lied

20 about me in court.  We deal with the Mexican cartel,

21 hate America and make dirty money on drugs and

22 illegal immigrants."  And then the next comment

23 says, "Kiss my American ass, Mexican cartel and drug

24 dealers."  The next comment says, "I remember those

25 days."

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 21 of 126

1      **Q**    What account is associated with those

2   comments?

3      **A**    Marian Hudak.

4      **Q**    Turning your attention to Government's

5   Exhibit No. 8, is this a posting made to Mr. Hudak's

6   Facebook account on February 10, 2023?

7      **A**    Yes.

8      **Q**    Is this a screen-shot of the video taken

9   of the same residence that was featured in the post

10  in Government's Exhibits 4 and 5?

11     **A**    It is.

12     **Q**    Is that the Duarte's residence?

13     **A**    It is.

14     **Q**    Is there now a fence between the

15  properties where there was not one before?

16     **A**    There is.

17     **Q**    Do you know who built that fence?

18     **A**    The Duartes.

19     **Q**    And what is the comment underneath the

20  image there?

21     **A**    It says, "And she put a no contact against

22  me and always continues to cause problems that

23  harass my family and I."

24     **Q**    And is it your understanding, that

25  Ms. Duarte had in fact taken out a new contact order

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 22 of 126

1  on Mr. Hudak on or around September 2022?

2      **A**    She did.

3      **Q**    Turning your attention now to Government's

4  Exhibit No. 9, is this a screen-shot of a posting

5  made to Mr. Hudak's Facebook account also on

6  February 10th, 2023?

7      **A**    Yes.

8      **Q**    And is it again an image of the Duarte's

9  residence?

10     **A**    It is.

11     **Q**    Is there a comment underneath the image?

12     **A**    Yes.  It says, "She is a Mexican."

13     **Q**    And which account made that comment?

14     **A**    Marian Hudak.

15     **Q**    Turning your attention now to Government's

16  Exhibit No. 10, is this a posting made to

17  Mr. Hudak's Facebook account on May 23rd, 2023?

18     **A**    It is.

19     **Q**    What is written on this image of the wolf?

20     **A**    It says, "Welcome to my house.  That door

21  you just kicked in was locked for your protection

22  and not mine."

23     **Q**    Do you have any -- excuse me, are you

24  familiar with lone wolf imagery through your work

25  with the FBI?

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 23 of 126

1    **A**    I am.  I'm familiar with the lone wolf

2    imagery, which to us typically means somebody who

3    acts alone, is not affiliated with any groups, but

4    is motivated by some sort of grievance or ideology

5    to motivate towards violence.

6    **Q**    And now turning your attention to

7    Government's Exhibit No. 11, is this a posting made

8    to Mr. Hudak's Facebook account on May 23rd, 2023,

9    as well?

10    **A**    It is.

11    **Q**    And what are the words that are written on

12    the image of the wolf?

13    **A**    "I have a love I would die to protect, but

14    I won't go down without a fight.  Don't

15    (indiscernible) with that love unless you are

16    prepared to meet your ends."

17    **Q**    Now drawing your attention to June 22nd,

18    2023, did you participate, along with other law

19    enforcement, in a search of the Mr. Hudak's

20    residence in Concord?

21    **A**    I did.

22    **Q**    Did you understand three people to live at

23    the residence at the time?

24    **A**    Yes.

25    **Q**    Was that Mr. Hudak, his 21-year-old child

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 24 of 126

1 and his six-year-old child?

2     **A**   Yes.

3     **Q**   Were photographs taken of certain items in

4 the residence and in Mr. Hudak's two vehicles, one

5 of which was parked at the residence and another

6 which was parked at the state probation office?

7     **A**   Yes.

8     **Q**   I'm directing your attention now to

9 Government's Exhibit No. 12.  What is featured in

10 these images?

11     **A**   In the top image, we have a U.S. Secret

12 Service badge that says, "special agent."  In the

13 bottom image we have a collection of ammunition.

14     **Q**   Were these items recovered from

15 Mr. Hudak's home?

16     **A**   They were.

17     **Q**   Is Mr. Hudak a special agent with the

18 United States Secret Service?

19     **A**   He is not to my knowledge.

20     **Q**   Moving on to Government's Exhibit 13, what

21 is featured here?

22     **A**   The ammunition that was in the home.

23     **Q**   Moving on to Government's Exhibit No. 14,

24 what is featured in this image?

25     **A**   We have a motion and order to show cause

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 25 of 126

1  for failure to comply with a no contact order for

2  stalking or nonconsensual sexual conduct with the

3  name of Abby Duarte.

4      **Q**    Is this a photograph of the hard copy that

5  was located within Mr. Hudak's residence?

6      **A**    Yes.

7      **Q**    And at the bottom in the far right-hand

8  corner, what does it say for the date issued?

9      **A**    It says 3/6/23.

10     **Q**    Moving on to Government's Exhibit No. 15,

11  what is featured in this image?

12     **A**    We have a consent order, no contact order

13  for stalking or nonconsensual sexual conduct.

14     **Q**    And again, was Ms. Duarte the complainant

15  in this procedure?

16     **A**    Yes.

17     **Q**    And is this a photograph of the hard copy

18  of this order that was located in Mr. Hudak's

19  residence?

20     **A**    Yes.

21     **Q**    And this is a contempt order, is that

22  correct?

23     **A**    Yes.

24     **Q**    Moving on to Government's Exhibit No. 16,

25  what is featured in this photograph?

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 26 of 126

1    **A**    Here we have the flag with the swastika

2 and the iron cross.

3    **Q**    And was this also located in Mr. Hudak's

4 residence?

5    **A**    Yes.

6    **Q**    Moving to Government's Exhibit No. 17,

7 what is pictured in this photograph?

8    **A**    We have a box which contains tactical

9 gear, including two ballistic vests, one with the

10 placard saying, "Police."

11    **Q**    And now moving on to Government's Exhibit

12 18, what is featured in this photograph?

13    **A**    Here we have just part of the collection

14 of knives that were -- that was located in the home.

15    **Q**    Moving on to Government's Exhibit 19, what

16 is featured in this photograph?

17    **A**    Some additional, you know, bladed weapons,

18 as well as two law enforcement badges.

19    **Q**    Moving on to Government's Exhibit No. 20,

20 what is depicted here?

21    **A**    This appears to be a radar gun.

22    **Q**    And where was this located?

23    **A**    This was located in Mr. Hudak's bedroom.

24    **Q**    And moving on to Government's Exhibit No.

25 21, what's featured in this photograph?

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 27 of 126

1    **A**    Here we have some edged weapons as well as
2  what looks like a Taser, and then like a sword.

3    **Q**    And where were these items located?

4    **A**    I believe in a closet, but I am -- I
5  cannot recall the exact location.

6    **Q**    But they were located in this residence?

7    **A**    In the house, yes.

8    **Q**    Moving on to Government's Exhibit No. 22,
9  what is featured in this image?

10    **A**    Here we have in the back of the drawer the
11  Nazi patch, Velcro patch with a swastika on it.

12    **Q**    And now Government's Exhibit No. 23, what
13  is this an image of?

14    **A**    This image is of, like, a book or pamphlet
15  that was located in Mr. Hudak's house, which depicts
16  racial slurs.

17    **Q**    Moving on to Government's Exhibit No. 24,
18  what is featured in this image?

19    **A**    This is the same book that also features
20  racial slurs.

21    **Q**    Moving on to Government's Exhibit No. 25,
22  what is featured here?

23    **A**    Here we have some items that were located
24  in Mr. Hudak's truck that was parked in front of the
25  probation office.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 28 of 126

1    **Q**    And are these various weapons?

2    **A**    Yes.

3    **Q**    Looking now at Government's Exhibit No.

4    26, what is featured here?

5    **A**    This appears to be a little stun gun that

6    was located in the Honda parked at the residence.

7    **Q**    And when you say, "this appears to be," is

8    that based on your training and experience with

9    weapons in your training as an FBI agent?

10    **A**    Yes.

11    **Q**    Moving on to Government's Exhibit No. 27,

12    what is the object immediately to the left of the

13    pill bottle?

14    **A**    It is a wire-pull smoke grenade.

15    **Q**    And where was this located?

16    **A**    In the truck at the probation office.

17    **Q**    And now moving on to Government's Exhibit

18    No. 28, what is featured in this image?

19    **A**    Ammunition.

20    **Q**    And where was this located?

21    **A**    The truck at the probation office.

22    **Q**    And finally, Government's Exhibit 29, what

23    is this object here, that is the black object with

24    the yellow on it?

25    **A**    It is a weapon-mounted light.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 29 of 126

1    **Q**    And so can this be mounted to a pistol?

2    **A**    Yes.

3    **Q**    Can it be mounted to a rifle?

4    **A**    Yes.

5    **Q**    Where was this located?

6    **A**    In the truck.

7         **MS. McFADDEN:**  Your Honor, I have no

8    further questions for the witness.

9         **THE COURT:**  All right.

10         **MS. COSTNER:**  Thank you, Your Honor.  If I

11    may have just a minute to get this back

12    together.

13                     **CROSS-EXAMINATION**

14    **BY MS. COSTNER:**

15    **Q**    Agent Franks, I may have missed it.  When

16    did you become involved yourself with the case?

17    **A**    In October of 2022.

18    **Q**    The affidavit, you testified in large part

19    from the affidavit that was filed along with the

20    complaint; is that correct?

21    **A**    Yes, Ma'am.

22    **Q**    And that was not signed by you, that was a

23    different agent.

24    **A**    Correct.

25    **Q**    Have you, yourself, participated in the

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 30 of 126

1  investigation of this case?

2      **A**    I have.

3      **Q**    And you testified that the FBI first

4  became aware of Mr. Hudak in March of 2020, there

5  was a tip from the Concord Police.

6      **A**    Yes, Ma'am.

7      **Q**    And I may have misunderstood that.  That

8  was based on Mr. Hudak saying that -- saying some

9  things among them that he wanted to or was going to

10  go to Seria?

11      **A**    Yes, Ma'am.

12      **Q**    Was he charged with any crime as a result

13  of that?

14      **A**    He was not.

15      **Q**    And do you know where they say those

16  comments took place?

17      **A**    Like the location where they took place?

18      **Q**    Yes.

19      **A**    I don't know.

20      **Q**    So you don't know that that was his yard

21  or just where it was?

22      **A**    I'm not aware.

23      **Q**    But bottom line is, there was no crime

24  identified, he was not charged with anything.

25      **A**    That's correct.  However, they were

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 31 of 126

1  alarmed enough that they reported the comments to

2  the FBI.

3      **Q**    And do you have any evidence that he in

4  fact made plans to go to Seria?

5      **A**    I don't.

6      **Q**    And do you have any information as to

7  why -- or I'm going to strike that.

8                Moving on to October 13th, this

9  altercation between Mr. Hudak and J.S.

10                Now, A.R. was -- was A.R. in the

11  vehicle during all of this time?

12      **A**    No, Ma'am.

13      **Q**    And so J.S. and Mr. Hudak were driving

14  down the Concord Parkway?

15      **A**    Yes.

16      **Q**    Okay.  And I believe you testified that

17  J.S. saw or noticed the truck.

18      **A**    Yes.

19      **Q**    And pulled beside the truck and looked at

20  it, correct?

21      **A**    That's not my understanding.  It is that

22  traffic forced them to get close.

23      **Q**    Okay.  But then he looked at the truck?

24      **A**    Correct, yes.

25      **Q**    And noticed how it -- what it looked like.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 32 of 126

1 And so -- did the first, I guess contact, that was

2 more up close and personal between Mr. Hudak and

3 J.S.  Did that take place as they were driving or

4 did they stop?  Was there a stopping point?

5     **A**    It is my understanding that the first

6 contact took place as they were driving when they

7 made eye contact, and then ultimately they stopped

8 at the intersection and --

9     **Q**    And that's when J.S. pointed his pistol at

10 Mr. Hudak?

11    **A**    I wasn't aware -- I'm not aware of that.

12    **Q**    Well, your testimony, and I wrote it down

13 was, that J.S. pointed a pistol at Mr. Hudak.

14    **A**    I didn't say that.

15    **Q**    So --

16    **A**    I said that J.S. was startled enough that

17 he reached for the pistol that he had in his car.

18    **Q**    And my recollection and my notes at least

19 say that J.S. pointed a pistol at Mr. Hudak, and

20 then Mr. Hudak walked away and got back in his car.

21 That's not your understanding of the evidence?

22    **A**    That's not my recollection.

23    **Q**    All right.  May I have a moment, Your

24 Honor?  I just have to review the affidavit.  Sorry.

25                I may have written the notes down

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 33 of 126

1  wrong, but looking at the affidavit, they stopped at

2  a stoplight, is that correct, or a stop sign?

3      A    Yes, Ma'am.

4      Q    And J.S. reached for his pistol?

5      A    Yes.  That's my understanding.

6      Q    And so now once they got to the apartment

7  complex where J.S. lived, that's when J.S. contacted

8  A.R. and asked for her to bring him his rifle?

9      A    I believe it was en route from the

10 incident to the apartment complex.

11     Q    And that was an assault rifle, correct?

12     A    Correct.

13     Q    Did the police seize or see the assault

14 rifle when they responded?

15     A    I know that they are aware of it.  I don't

16 know if they seized it.

17     Q    Did they see or seize the pistol that J.S.

18 had in his vehicle as he was driving along?

19     A    Not to my knowledge.

20     Q    And I believe it is your testimony, that

21 Mr. Hudak's truck, once he was encountered by the

22 police, was searched?

23     A    Yes, Ma'am.

24     Q    And no pistol was found?

25     A    No.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 34 of 126

```
 1     Q     And he was taken downtown, or I guess to
 2  the station and charged, correct?
 3     A     At that time, I'm not sure.  I don't
 4  believe he was taken down at that time.  I think the
 5  police came back later that evening and ultimately
 6  arrested him.
 7     Q     Okay.  And did they come with a search
 8  warrant for his vehicle?
 9     A     They did not.
10     Q     And you testified that their search was
11  limited, is that correct?
12     A     Correct.
13     Q     So let me make sure I understand this.
14  The police knew from J.S. and A.R., that they had
15  reported that Mr. Hudak had a pistol, correct?
16     A     Yes.
17     Q     And K.E., a witness, also reported seeing
18  a pistol in the hands of Mr. Hudak, but the police
19  conducted a search of the vehicle, did not find a
20  pistol, correct.
21     A     They performed a limited sweep.
22     Q     In a vehicle where there had been a report
23  that a person who was later charged had a pistol and
24  had pointed it and threatened others, is that
25  correct?
```

UNITED STATES vs. MARIAN HUDAK    1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 35 of 126

1    **A**    Correct.

2    **Q**    It is true, isn't it, that when A.R.

3    contacted the police, A.R. reported this

4    altercation, but at no time reported seeing -- when

5    she made that call, that Mr. Hudak had a firearm,

6    correct?

7    **A**    I can't recall that.

8    **Q**    Okay.  May I have a moment?

9              So look at the affidavit that was

10   signed by one of your -- that you're testifying from

11   and that was signed by a fellow FBI agent.  It says

12   in a footnote that, "J.S. called 911 during the

13   encounter, but did not contemporaneously report

14   seeing a gun in Hudak's hand."  Would that be a fair

15   recitation of what happened?

16   **A**    Yes.

17   **Q**    And so it was only later that there was

18   this report of the firearm, correct?

19   **A**    I mean, not too much later.

20   **Q**    Certainly no one was calling 911 and

21   saying there is a man with a gun who is threatening

22   us?

23   **A**    I would need to check my notes.

24   **Q**    Well, again, if the footnote says, "J.S.

25   called 911" --

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 36 of 126

```
 1          MS. McFADDEN:  Objection, asked and
 2     answered.
 3          MS. COSTNER:  Well, Your Honor, she's
 4     changing her answer.
 5          THE COURT:  Overruled.
 6          MS. COSTNER:  Thank you, Your Honor.
 7   BY MS. COSTNER:
 8     Q    The footnote says, "J.S. called 911 during
 9   the encounter, but did not contemporaneously report
10   seeing a gun in Hudak's hand."  Would it be fair to
11   say that that was not reported to anyone by J.S.?
12     A    By J.S.
13     Q    Okay.  And did you bring any evidence or
14   any recording that shows that A.R. reported in a 911
15   call to police, that Mr. Hudak had a firearm?
16     A    I don't have a recording of that call.
17     Q    Do you have anything in your notes that
18   indicates that that was said to police as part of a
19   911 call?
20     A    Only prior interviews that we've done, but
21   I would need to refer back to my notes.
22     Q    Prior interviews with the 911 operator?
23     A    No, with A.R. or J.S.
24     Q    Well, aren't those calls recorded?
25     A    They are, but I believe in this case, the
```

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 37 of 126

1  call from A.R. was not recorded, but I would need to

2  refer back to my notes.

3      **Q**    So is it not standard practice that 911

4  calls are recorded?

5      **A**    I can't speak for Concord Communications.

6      **Q**    So all of the 911 calls, this particular

7  one was not recorded, is that your testimony?

8          **MS. McFADDEN:**  Objection.

9          **MS. COSTNER:**  I'll move on, Your Honor.

10         **THE COURT:**  All right.

11 **BY MS. COSTNER:**

12     **Q**    Now you looked at Exhibit 2 -- let's go

13 back to Exhibit 1 for just a minute.

14             This black Cadillac, who was the

15 driver of the black Cadillac?

16     **A**    Unknown at this time.

17     **Q**    So no one ever stopped or found the driver

18 of the black Cadillac?

19     **A**    No, Ma'am.

20     **Q**    And so I take it that that black Cadillac

21 was never searched?

22     **A**    Correct.

23     **Q**    No record of anyone in that black Cadillac

24 with a firearm?

25     **A**    Not to my knowledge, no.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 38 of 126

1  **Q**   In regard to Exhibit 2, the truck with the
2  knives, was that photo taken the day that this
3  altercation happened between Mr. Hudak and J.S.?
4  **A**   No.
5  **Q**   This was a different day?
6  **A**   Yes.
7  **Q**   There was no report that Mr. Hudak, on the
8  day he had the altercation with J.S., jumped out
9  with a knife and threatened anybody with a knife,
10 correct?
11 **A**   There was not.
12 **Q**   Now I'm going to move on to the incident
13 on -- was it November 27th, 2021?
14 **A**   Yes, Ma'am.
15 **Q**   Okay.  And that was the fight, it sounds
16 like a fistfight between Mr. Hudak and Mr. Duarte?
17 **A**   Correct.
18 **Q**   When Mr. Hudak came out, yelled at him
19 because there were headlights shining and he
20 contended it woke his daughter up.
21 **A**   Uh-huh.  That's right.
22 **Q**   So I believe it was your testimony that
23 Mr. Duarte said, you know, "Come on, let's do
24 something about it," so he instigated the fight, the
25 physical fight, correct?

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 39 of 126

1      **A**      There was an argumentation before and I

2   believe --

3      **Q**      So they were fighting and then it was

4   Mr. Duarte that went and got a shotgun, correct?

5      **A**      Correct.

6      **Q**      And Mr. Hudak, on that occasion, did not

7   have a shotgun, did he?

8      **A**      No.

9      **Q**      Now with respect to -- you testified about

10  the -- I'm going to move on to this incident that

11  happened at Sam's.

12     **A**      Okay.

13     **Q**      Mr. Hudak allegedly was saying racial

14  slurs over a loud speaker.  Was Mr. Hudak charged

15  with possessing or found in possession of any guns

16  or weapons on that occasion?

17     **A**      No.

18     **Q**      Was he asked or told to leave Sam's?

19     **A**      Yes.

20     **Q**      And he left Sam's when he was told to

21  leave?

22     **A**      Correct.

23     **Q**      You testified that neighbors have

24  witnessed Mr. Hudak yelling things, insulting

25  things, according to them.  Was he waving guns or

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 40 of 126

1  threatening them with weapons on that occasion?

2      **A**    He was not.

3      **Q**    And when there was an arrest, I believe

4  you said on July 2nd, 2022, injury to property, did

5  he shoot a gun at someone?

6      **A**    No.

7      **Q**    And he was put on probation, I believe you

8  said, for spitting in somebody's face, hitting a

9  car.  That didn't involve the Duartes, did it?

10     **A**    No.

11     **Q**    It didn't involve J.S. or A.R., did it?

12     **A**    No.

13     **Q**    With respect to the exhibits that

14 display -- or, let's just go on to three, since

15 that's the next one in line.

16          It shows a swastika and the KKK and

17 this iron cross ring.  You said those were found in

18 his residence?

19     **A**    Yes.  The probation officer found them,

20 and I'm not aware of where in the residence they

21 were located.

22     **Q**    Okay.  And so do you know whether or not

23 Mr. Hudak is a collector of these things?

24     **A**    I am not aware.

25     **Q**    And there is nothing inherently illegal

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 41 of 126

1   about owning such things, isn't that correct?

2       **A**    Correct.

3       **Q**    Unless you stole them from somebody, but

4   if you bought them legitimately, you are allowed to

5   have them, correct?

6       **A**    Correct.

7       **Q**    Any evidence that he took that iron cross

8   skull ring and was hitting people with it or using

9   it as a brass knuckle?

10      **A**    No.  It was just found.

11      **Q**    It was just found in his home, correct?

12      **A**    Correct.

13      **Q**    All right.  With respect to Exhibits 4

14  through 10, I believe these are the -- those were

15  all Facebook posts?

16      **A**    Yes.

17      **Q**    All right.  Are the Duartes' Facebook

18  friends of Mr. Hudak's, do you know?

19      **A**    I don't know.

20      **Q**    You never looked to see?

21      **A**    No, Ma'am.

22      **Q**    And what about J.S. and A.R., do you know

23  if they are Facebook friends of Mr. Hudak?

24      **A**    I don't know.

25      **Q**    Did you look to see who his Facebook

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 42 of 126

1  friends are?

2      **A**    I personally didn't, but I know at some

3  point it was done, most likely.

4      **Q**    You don't have --

5      **A**    I don't have that information.

6      **Q**    Okay.  And so the Facebook posts that he

7  made, do you know whether he was instant messaging

8  these to the Duartes or to J.S. or to A.R.?

9      **A**    I don't.

10      **Q**    And in these Facebook posts, let's look at

11  number four.  He says, "Idiots from Mexico in my

12  neighborhood, illegal immigrants."  He doesn't

13  threaten to harm them, to go over there to do

14  anything to them, does he?

15      **A**    He doesn't.

16      **Q**    Same with Exhibit No. 5 -- I'm sorry, that

17  was -- Exhibit 5, "Mexican idiot asking for trouble

18  every single day."  He doesn't threaten them.  There

19  is no threats of violence or a gun or anything like

20  that, correct?

21      **A**    Correct.

22      **Q**    I mean, clearly he doesn't like them, that

23  would be a fair thing, correct?

24      **A**    (No verbal response heard.)

25      **Q**    There is nothing inherent or illegal about

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 43 of 126

1 expressing your dislike of people, you have a First

2 Amendment right to do that, isn't that true?

3     **A**     That's true.  But based on the previous

4 altercation and the continued threats, this family

5 is certainly intimidated by Mr. Hudak's actions and

6 posts.

7     **Q**     Well, if Mr. Hudak is not Facebook friends

8 with any of these folks, how are they being -- I

9 mean, they are not -- he's not really communicating

10 a threat to them, is he, if that's the case?

11     **A**     I mean, it is public Facebook.

12     **Q**     And there is nothing in these particular

13 posts where there is a specific threat against

14 anybody, isn't that correct?

15     **A**     That's correct.

16     **Q**     Now you testified that wolves mean

17 that -- I don't know, that somehow that is some

18 symbol of being independent and also being -- tell

19 me again what it means if you like wolves.

20         **MS. McFADDEN:**  Objection.

21         **THE COURT:**  She is asking, I think, from

22     cross-examination.  You asked what wolves mean.

23     Objection is overruled.

24         **THE WITNESS:**  I'm sorry, I didn't.

25

UNITED STATES vs. MARIAN HUDAK    1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 44 of 126

BY MS. COSTNER:

Q    I wasn't quite sure I understood.  So in
your opinion, or in your training, posting pictures
of wolves means that there is some -- that you're
part of some hate group, basically?

A    No.  A lone wolf, you know, identifying as
a lone wolf is concerning because it seems to be an
actor that is motivated by some sort of idealogy or
animus, not affiliated with any groups that could,
you know, move to violence quickly.

Q    Okay.  Well, let's look at Exhibit 10.  It
shows a wolf and it says, "Welcome to our house.
That door you just kicked in was locked for your
protection, not mine."  What group does that show
animus against?

A    No particular group.

Q    It could be he just likes wolves?

A    Could be.

Q    Correct.  And when you look at -- let's
look at Exhibit 11.  "I have a love I've got to
protect, but I won't go down without a fight.  Don't
threaten what I love unless you are prepared to meet
your end."  What group does that show animus
against?

A    No particular group.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 45 of 126

1    **Q**    It might show animus against somebody that

2    threatens somebody, right?

3    **A**    Correct.

4    **Q**    But there is no Hispanic -- no threat, no

5    other group that this targets, isn't that correct?

6    **A**    Correct.

7    **Q**    No swastika is pictured in this photo.

8    **A**    No swastika in this photo; however,

9    looking at the greater picture --

10    **Q**    I'm sorry, the --

11    **A**    I'm sorry.

12    **Q**    The swastikas were found in his home?

13    **A**    Correct.

14    **Q**    There is nothing in that post around that

15    wolf, isn't that correct?

16    **A**    There is not.

17    **Q**    And Exhibit 12 -- there we go, the Secret

18    Service -- okay.  This was a search on, you said

19    recently, last week, correct?

20    **A**    Yes, Ma'am.

21    **Q**    Okay.  And where was the Secret Service

22    badge found?

23    **A**    In the residence.  I believe in his

24    bedroom.

25    **Q**    And just sitting on the bed?  Was it in a

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 46 of 126

1  drawer?  Was it in a case?  Was it in a container?

2  **A**  I don't recall.

3  **Q**  Were you there?

4  **A**  I was there.

5  **Q**  So you have a photo of it.  That's where

6  somebody put it to take a photo of it; isn't that

7  correct?

8  **A**  Correct.

9  **Q**  And you have no idea whether he had this

10  in like a box, where he might have other

11  collectibles?  You don't know where it was, do you?

12  **A**  I don't recall the exact location.

13  **Q**  Was it in his pocket?

14  **A**  No.

15  **Q**  Was it on his person?

16  **A**  It was not.

17  **Q**  Was it in a jacket pocket?

18  **A**  No.

19  **Q**  And the box of ammunition, where was that

20  found?

21  **A**  I don't recall the exact location of this

22  box of ammunition.

23  **Q**  So for all you know, it could have been on

24  a closet shelf?

25  **A**  Potentially, yes.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1    **Q**    And this bag of bullets, Exhibit 13, where
2   was that found?

3    **A**    In the residence.  I don't recall the
4   exact location.

5    **Q**    You don't know where it was?  No firearms
6   were discovered in the residence, correct?

7    **A**    Correct.

8    **Q**    So these bullets weren't in proximity to a
9   firearm or a magazine or anything like that?

10   **A**    There were magazines in the residence.  I
11  don't know if these bullets were in proximity to a
12  magazine.

13   **Q**    You don't know where it was found.  Again,
14  it could have been in a box on a closet shelf.  It
15  could have been under the bed.  It could have been
16  in a drawer.

17   **A**    Yes, Ma'am.

18   **Q**    Now he had these -- I'm looking at
19  Exhibits 14 and 15, the two -- the motion and order
20  to show cause and the contempt order.  That was
21  paperwork in his home, correct?

22   **A**    Correct.  Yes, Ma'am.

23   **Q**    All right.  Where was it found?

24   **A**    I don't recall the exact location.

25   **Q**    Moving on to Exhibit 16, what is this item

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 48 of 126

1  that has the swastika on it?

2      **A**    A flag.

3      **Q**    A flag, and so this is a closet that it's

4  found in?

5      **A**    That's what it looks like, yes, Ma'am.

6      **Q**    Do you know whether -- I mean, was the

7  closet door open?  Was it there like that, or was it

8  pulled out of something?

9      **A**    I don't recall.

10     **Q**    So you don't know whether he had that

11  folded up and in a container with other

12  collectables?

13     **A**    Correct.

14     **Q**    Moving on to Exhibit 17, the box with the

15  tactical gear and the ballistic vest, now those are

16  in a container.

17     **A**    Yes, Ma'am.

18     **Q**    And what room of the house is this?

19     **A**    His bedroom.

20     **Q**    His bedroom.  His bedroom or their

21  bedroom?

22     **A**    A bedroom.

23     **Q**    A bedroom.  So you don't know whose

24  bedroom it was?

25     **A**    Correct.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 49 of 126

1    **Q**    Could you tell, was there a bed in that
2  bedroom?

3    **A**    Yes.

4    **Q**    And was there evidence of whether somebody
5  was sleeping in it or whether it was a guest room or
6  something like that?

7    **A**    I couldn't say.

8    **Q**    And with respect to the items found in
9  this box, did you all open the box to take the
10 photos?

11   **A**    I don't know exactly.

12   **Q**    You don't know if somebody opened the box
13 or not?

14   **A**    Uh-huh.

15   **Q**    But it is in a container?

16   **A**    Correct.

17   **Q**    He wasn't wearing these items?

18   **A**    Correct.

19   **Q**    He hasn't been arrested or found wearing
20 these items in any, you know, in the altercations
21 and incidents you've testified to?

22   **A**    Correct.

23   **Q**    You don't have any photos of him wearing
24 these items, correct?

25   **A**    I don't know about these particular items,

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1  no.

2      **Q**    And with respect to -- I believe you got

3  some close-up pictures.  Is that what, 18 and 19,

4  are some of the knives and things that are found?

5      **A**    Yes.

6      **Q**    In the bedroom?

7      **A**    Uh-huh.

8      **Q**    You seized those items.  Did you remove

9  them?

10     **A**    We removed the law enforcement badges.

11     **Q**    And he wasn't -- those badges are

12 displayed along with the knives on some type of --

13 is that a magnetic bar, like one might put knives

14 they don't use, the knives, or were they somehow

15 affixed to the bar?

16     **A**    Yes, they were.  Seemed like magnets on

17 the bar.

18     **Q**    So they are all in a row.  They are all on

19 a bar.  They are all in this room, correct?

20     **A**    Correct.

21     **Q**    He wasn't wearing a badge?

22     **A**    Not at that time.

23     **Q**    In other words, you didn't find badges,

24 like police badges that were affixed to a jacket or

25 a pocket, or a police uniform in his possession,

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1 correct?

2     **A**    We found a police placard attached to one

3 of the ballistic vests, but none of the badges

4 attached.

5     **Q**    Is that the ballistic vest that is found

6 in this container?

7     **A**    Yes.

8     **Q**    You can see the word "police" there.  So

9 that wasn't something that he was wearing?

10     **A**    Correct.

11     **Q**    He also has, looking at Exhibit 18, a

12 knife collection, some of them look like they have a

13 flag, American flag print on them.

14     **A**    Correct.

15     **Q**    Some, I can't tell, it might be a little

16 bit of camouflage, something on those handles?

17     **A**    Yes, correct.

18     **Q**    And then a United States Army badge above

19 that, so a display, as one might say, correct?

20     **A**    Correct.

21     **Q**    And then Exhibit 19 is just a close-up of

22 that, correct?

23     **A**    Correct.  A different location.  18 and

24 19, weren't the same.

25     **Q**    Eighteen and 19.  But this, looking at 17,

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 52 of 126

1  this is a close-up of the bar right by the

2  container, right?

3      **A**    Yes, Ma'am.

4      **Q**    And so one of these badges say "special

5  police." do you know where that is from?

6      **A**    I don't.

7      **Q**    The other one says "security enforcement

8  officer."  Do you know where that is from?

9      **A**    I don't.

10      **Q**    Exhibit 20, you've got -- you said a speed

11  check, so that's something like an officer might

12  point at a car to determine rate of speed?

13      **A**    Yes.

14      **Q**    And do you know whether it was

15  operational?

16      **A**    I don't.

17      **Q**    Do you know whether he was using it for

18  anything?

19      **A**    I don't.

20      **Q**    So where was it found?  I see it is on

21  sort of a camouflage bag.  Was it in that bag?

22      **A**    I believe it was.

23      **Q**    Okay.  And where was the bag found?

24      **A**    It was in that same room.  I don't know

25  the exact location.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 53 of 126

1    **Q**    So in the same room with the container and
2  then the things displayed on the magnetic bars,
3  correct?

4    **A**    Yes.

5    **Q**    So Exhibit 21, I see that those items are
6  displayed on a weight bench.  Is that right?

7    **A**    Yes.

8    **Q**    And I think you said one of them is a
9  taser.  Was it operational?

10   **A**    I do not know.

11   **Q**    When the search warrant was executed, were
12 all of these things lined up on a weight bench?

13   **A**    They were not.

14   **Q**    Where were they?

15   **A**    I don't recall their exact location.

16   **Q**    Were they in the room with the weight
17 bench?

18   **A**    If they weren't in there, they were in a
19 closet adjacent.

20   **Q**    Was the weight bench in this bedroom or
21 was it in a separate room?

22   **A**    It was in that separate room.

23   **Q**    So was that more like an exercise room?  I
24 mean, it had a weight bench and some weights and
25 things like that.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 54 of 126

1     **A**     I believe it had a weight bench and
2  weights.

3     **Q**     And there are some weights, you can see
4  them sort of near the weight bench, correct?

5     **A**     Correct.

6     **Q**     And there was a closet in there?

7     **A**     I don't know if it was in -- it was right
8  near the room, like in the entryway area.

9     **Q**     So you don't know whether these knives
10  were in a container, in a closet, on a shelf, you
11  have no idea how they were secured or contained,
12  other than the fact that they had been now spread
13  out over a weight bench.  Is that correct?

14     **A**     I don't know the location where they were
15  found.

16     **Q**     These were not -- he wasn't wearing these
17  on his person, correct?

18     **A**     Correct.

19     **Q**     And he wasn't holding the taser, he wasn't
20  carrying the taser when you all went in?

21     **A**     At the time of his arrest?

22     **Q**     Yes.  Was he?

23     **A**     No.

24     **Q**     And Number Exhibit 22, you noted the
25  swastika badge.  Where was this?  Is this a desk or

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 55 of 126

1  a table?

2    **A**    It's a desk.

3    **Q**    And where was it?

4    **A**    I believe in the same room as the knives

5  with the magnet strips on the wall.

6    **Q**    So a bedroom that you are not sure if

7  anybody occupied or not?

8    **A**    Correct.

9    **Q**    And so that was a drawer that has now been

10 opened, correct?

11   **A**    Correct.

12   **Q**    By somebody -- by law enforcement, as a

13 part of the search?

14   **A**    Correct.

15   **Q**    And then a photo made of this badge that

16 is in the drawer, in the back of the drawer?

17   **A**    Correct.

18   **Q**    He wasn't wearing the badge?

19   **A**    He was not.

20   **Q**    The book that you testified about,

21 Exhibits 23 and 24, where was that found?

22   **A**    It was found in the same room, the bedroom

23 that I'm not sure if it is being occupied, but I'm

24 not sure of the exact location.

25   **Q**    So you don't know where this book was

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 56 of 126

1  located?

2     **A**    In the bedroom.

3     **Q**    I understand that, but don't know if that

4  was in a container with the other memorabilia or

5  other items of the nature that we've looked at

6  before, correct?

7     **A**    Correct.

8     **Q**    With respect to Exhibit 25, these were

9  items found in the truck?

10    **A**    Yes, Ma'am.

11    **Q**    So it looks like a hammer.  You don't

12  consider that -- well, I understand it can be used

13  as a dangerous weapon, not inherently dangerous

14  weapon, correct?

15    **A**    (Inaudible.)

16    **Q**    So to the right, those -- are those

17  hatchet pipes?

18    **A**    They look like axes, hatchets.

19    **Q**    And they are pipes, though, aren't they?

20  They got a little thing like so you could smoke it,

21  sort of a novelty sort of thing?

22    **A**    I don't know.

23    **Q**    Were they in the truck?

24    **A**    I don't know their exact location.

25    **Q**    And so towards the seatbelt, what is that?

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 57 of 126

1       **A**     I'm not sure.

2       **Q**     And so there is honestly a knife kind of

3    near that item.

4       **A**     Correct.

5       **Q**     Where was that found?

6       **A**     I don't know the exact location in the

7    truck.

8       **Q**     It looks like a box cutter.

9       **A**     Yes, Ma'am.

10      **Q**     Do you know where that was?

11      **A**     I don't know the exact location of that in

12   that truck.

13      **Q**     Is there a toolbox in the truck?

14      **A**     I don't know.

15      **Q**     So you don't know if this was in the back

16   in a toolbox, in a box, under a seat, anything like

17   that?

18      **A**     Correct.

19      **Q**     With respect to Exhibit 26, now you

20   said -- did you say this is a stun gun?

21      **A**     Yes, Ma'am.

22      **Q**     This was not found in Mr. Hudak's truck,

23   was it?

24      **A**     Correct.

25      **Q**     That was in a different car?

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 58 of 126

1      **A**    Yes, Ma'am.

2      **Q**    Not a car driven by Mr. Hudak, owned by

3  Mr. Hudak?

4      **A**    It was parked at his residence.

5      **Q**    Well, did you look to see who the car was

6  registered to?

7      **A**    I have no knowledge of that.

8      **Q**    As a part of the search, did you find any

9  evidence that Mr. Hudak was an owner, possessor or

10  driver of that car?

11      **A**    I have no knowledge of that.

12      **Q**    And where did the search of the truck

13  happen when you found these other items that are in

14  paragraph 25?

15      **A**    Where did it happen?

16      **Q**    Where was his truck?

17      **A**    Oh, it was parked near his probation

18  office.

19      **Q**    And that's the state probation officer,

20  that wasn't at his house?

21      **A**    Correct.  Yes, Ma'am.

22      **Q**    So he wasn't driving this car that this

23  item was found in?

24      **A**    Correct.

25      **Q**    So this is a legal weapon, if he doesn't

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1   own it, a person in general owning a stun gun?

2       **A**    Not to my knowledge.

3       **Q**    You didn't charge anybody with it?

4       **A**    No.

5       **Q**    Exhibit 27, you said that's a smoke

6   grenade.  Now if you deploy that, are things going

7   to, like, if you deployed a smoke grenade near that

8   table, would the table explode?

9       **A**    I have no knowledge.

10      **Q**    You don't know anything about smoke

11  grenades?

12      **A**    Not this particular smoke grenade.

13      **Q**    In general, do you have knowledge of smoke

14  grenades?

15      **A**    No.  Not -- no.  Just through training and

16  experience.

17      **Q**    So if you would, I guess explain then in

18  your opinion, or your knowledge, the significance of

19  a smoke grenade.

20          **MS. McFADDEN:**  Objection, irrelevant.

21          **THE COURT:**  Objection, sustained.

22  **BY MS. COSTNER:**

23      **Q**    Now the ammo in paragraph 28, there was no

24  firearm associated with that ammunition, correct?

25      **A**    Not located in our search.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 60 of 126

```
 1      Q     Not in the truck?

 2      A     Yes, Ma'am.

 3      Q     Not in the house?

 4      A     Yes, Ma'am.

 5      Q     Not on Mr. Hudak's person?

 6      A     Yes, Ma'am.

 7      Q     And what, again, what is depicted in 29?

 8      A     Twenty-nine looks to me to be a

 9 weapon-mounted light that mounts onto a firearm.

10      Q     A light?

11      A     Yes, Ma'am.

12      Q     No firearm associated with that that was

13 found in the truck?

14      A     No.

15      Q     That was found in the house?

16      A     No, Ma'am.

17      Q     Or that was found on Mr. Hudak?

18      A     Correct.

19           MS. COSTNER:  I think that's all the

20      questions I have.

21           THE COURT:  All right.  I was hoping that

22      we would get through this before we had to take

23      a break for lunch, but (inaudible due to papers

24      rustling.) We'll be away for an hour.

25           MS. McFADDEN:  Your Honor, would I have an
```

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 61 of 126

1      opportunity to redirect Special Agent Franks?

2           **THE COURT:**  I didn't say anything about we

3      were finished with the case, but I just can't

4      go any longer without eating something.

5           We're breaking for lunch for one hour.

6      (Luncheon recess taken.)

7           **THE COURT:**  All right.

8           **MS. McFADDEN:**  May Special Agent Franks

9      take the stand?

10          **THE COURT:**  Yes, she may take the stand

11     for redirect, as I recall.

12          **MS. McFADDEN:**  That's correct, Your Honor.

13     Thank you.

14                    REDIRECT EXAMINATION

15  **BY MS. McFADDEN:**

16     **Q**    Special Agent Franks, just a few follow-up

17  questions.  In terms of Mr. Hudak's arrest on

18  June 22nd, did that occur at his house?

19     **A**    It did not.

20     **Q**    Where did it occur?

21     **A**    At his probation office.

22     **Q**    Do you know the limitations as to whether

23  weapons can be carried on one's person into a

24  probation office?

25     **A**    Yes.  They cannot be.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 62 of 126

 1    **Q**    Was there a reason he was arrested at the

 2  probation office and not at his home?

 3    **A**    It was deemed to be the safest location

 4  for the arrest.

 5    **Q**    And was Mr. Hudak wearing any jewelry at

 6  the time of his arrest?

 7    **A**    He was wearing a ring.

 8    **Q**    What type of range was it?

 9    **A**    It depicted an iron cross.

10    **Q**    Is that similar to the item that we saw in

11  Government's exhibits earlier?

12    **A**    Yes.

13    **Q**    And regarding the taser and whether or not

14  it was operational, is it standard procedure of the

15  FBI to test-fire weapons at the time they are seized

16  or observed in the residence?

17    **A**    No, Ma'am.

18    **Q**    And why is that?

19    **A**    Unsafe.

20    **Q**    And finally, regarding Mr. Hudak and J.S.,

21  to your knowledge, did they have any pre-existing

22  relationship prior to that encounter on the Concord

23  Parkway?

24    **A**    Not to my knowledge.  I understand that

25  J.S. had seen Mr. Hudak before and they -- Mr. Hudak

1  had flipped J.S. off.

2      **Q**   But that was the extent of your

3  understanding of any relationship that they had?

4      **A**   Yes.

5          **MS. McFADDEN:**  I have no further

6      questions, Your Honor.

7          **THE COURT:**  Recross?

8          **MS. COSTNER:**  No recross.

9          **THE COURT:**  All right.  You may step down.

10         **MS. McFADDEN:**  We have no further evidence

11     to present in this matter and only proffer to

12     the Court the contents of the pretrial services

13     report that was prepared.

14         **THE COURT:**  All right.  Do you want to be

15     heard with respect to the pretrial services

16     report?

17         **MS. COSTNER:**  Yes, Your Honor.  I have

18     reviewed the pretrial services report with my

19     client, and we do have a couple of issues to

20     bring forth.

21         May I have just a moment to

22     find -- because it was disclosed this morning,

23     I couldn't print it, so if the Court will just

24     give me a minute to find it.

25         **THE COURT:**  You may have a minute.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 64 of 126

 1          **MS. COSTNER:**  Thank you.  If I may pull it

 2      up.  I did download it to my iPad, Your Honor,

 3      if I may just pull that up for a moment to

 4      refer to it.

 5          **THE COURT:**  All right.  While you're doing

 6      that, Ms. McFadden, had you intended to offer

 7      these exhibits?

 8          **MS. McFADDEN:**  Thank you, Your Honor.

 9      That was remise of me.  I would like to offer

10      Government's Exhibits 1 through 29 into

11      evidence.

12          **THE COURT:**  All right.

13          **MS. COSTNER:**  Your Honor, with respect --

14          **THE COURT:**  Wait a minute.

15      Go ahead.

16          **MS. COSTNER:**  With respect to the

17      presentence report, on page -- I'm sorry,

18      pretrial, the bail report, Your Honor, on page

19      four under mental health and substance abuse,

20      he just wanted me to make sure that the

21      Court -- and it doesn't really say, but he no

22      longer takes the Zolpiden for sleep.  He did

23      take it in 2020, but he no longer takes that

24      prescription medicine.

25          With respect to the -- on page -- hold on

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 65 of 126

1      just a minute.  On page four, where it shows

2      the prior criminal history, the charge on

3      11/7/2020, according to Mr. Hudak, he was not

4      charged with misdemeanor concealing a gun.  It

5      was concealing a weapon.  The weapon was a

6      knife.  So he would ask for that correction.

7           On page -- up at the top, the charge on

8      February 18th, 2021, he recalls being charged

9      with that.  He does not recall the disposition

10     where it says it was consolidated for judgment,

11     10 days imprisonment, suspended for six months.

12     He's not contesting it necessarily, Your Honor,

13     but he does not recall it, so he cannot agree

14     that that is an accurate statement of what

15     happened with that charge.

16          On page -- it's at the top where it

17     describes a probation violation.  Mr. Hudak,

18     agrees about all of the weapons that are

19     mentioned, but he denies that a stun gun was

20     located on that occasion.

21          Finally, going back to page two, it would

22     be the fourth paragraph that begins with, "The

23     probation officer spoke with the defendant's

24     daughter."

25          In speaking both with Mr. Hudak and his

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 66 of 126

1      daughter, he denies saying that she suffers

2      from anxiety and is not dependable.  In fact,

3      he would propose her as a third-party

4      custodian.

5          I talked with Ms. Hudak, his daughter, and

6      she further supported the denial of suffering

7      from anxiety and being not dependable, and is

8      willing to serve, and I can get into that

9      later, Your Honor.

10          But, so were it  -- I don't know that it

11      mentions it in the recommendations but, you

12      know, with respect to the probation officer's

13      discussion of Ms. Hudak as a possible

14      third-party custodian, that would be all of the

15      corrections or changes that we would request to

16      the bail report.

17          **THE COURT:**  All right.  Thank you.  Is

18      there evidence for the defendant?

19          **MS. COSTNER:**  Your Honor, there would be

20      evidence with respect to detention, not with

21      respect to probable cause or the preliminary

22      examination in this matter.

23          Your Honor, I would call Ingrid Hudak, my

24      client's daughter.

25          **THE COURT:**  All right.  Thank you.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 67 of 126

1          (INGRID HUDAK, DEFENSE WITNESS, WAS

2     SWORN.)

3                    DIRECT EXAMINATION

4  BY MS. COSTNER:

5     **Q**    Good afternoon, Ms. Hudak.  If you would,

6  for the record, please state your name.

7     **A**    Ingrid Michelle Hudak.

8     **Q**    Do you recognize the person seated next to

9  me?

10    **A**    Yes.

11    **Q**    How do you know Mr. Hudak?

12    **A**    He is my father.

13    **Q**    How old are you, Ms. Hudak?

14    **A**    Twenty-one.

15    **Q**    And where do you reside?

16    **A**    1765 Redford Circle in Concord, North

17 Carolina 28025.

18    **Q**    Up until last week, who did you reside

19 with?

20    **A**    I was in my home.

21    **Q**    And did any one else live there?

22    **A**    No.

23    **Q**    Prior to your dad's arrest last week, did

24 any one else live in your home?

25    **A**    No.  My sister comes.

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 68 of 126

```
1     Q    I'm not sure you are understanding me.
2  Maybe I can just make it a little more -- did your
3  father ever live in the home with you?
4     A    Oh, yes, yes.
5     Q    So he would be a person that lived with
6  you there, is that correct?
7     A    Yes.  That's correct.
8     Q    And how long -- have you resided with him
9  most of your life, part of your life, a couple of
10 years?
11    A    All of my life.
12    Q    Now your parents, are they together or are
13 they separated?
14    A    Separated.
15    Q    And where does your mother live?
16    A    She lives on Birchfield -- 5833
17 Bridgefield Lane in Concord, North Carolina.
18    Q    After your parents separated, who did you
19 reside with?
20    A    My father.
21    Q    And he has been there for the entire time?
22    A    Yes.
23    Q    Do you have -- are you currently employed?
24    A    No.
25    Q    And tell the Court -- you're 21 years old,
```

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 69 of 126

 1  is that correct?

 2      **A**    Yes.

 3      **Q**    And so have you graduated from high

 4  school?

 5      **A**    Yes.

 6      **Q**    And tell the Court a little bit about

 7  that, and your diploma and other degrees you may

 8  have earned during high school.

 9      **A**    Yes.  I graduated Cabarrus Community

10  College of Technology, and at the same time that I

11  graduated with my high school diploma, I also

12  graduated with an associates degree in science from

13  Rowan Cabarrus Community College in Concord.

14            Then I proceeded to go to college at

15  Cabarrus College of Health Sciences and obtained my

16  occupational therapy degree.  So I am a certified

17  occupational therapy assistant.

18      **Q**    And where did you receive that degree from

19  the Cabarrus College of Health Sciences?

20      **A**    Western.

21      **Q**    Tell the Court a little bit about what

22  that degree allows you to do.

23      **A**    It helps me treat patients in occupational

24  therapy, so if they have a stroke, I can work on

25  their goals and work towards their independence.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 70 of 126

```
 1      Q      And you do have a license in that?
 2      A      Yes.
 3      Q      Is that required as a part of -- for
 4 somebody to work in that field?
 5      A      Yes.
 6      Q      And what were your grades like in college?
 7      A      I was always an A-plus honor roll student.
 8      Q      After you graduated did you have to take a
 9 test or anything to get that certification?
10      A      Yes.
11      Q      And did you pass that on the first try?
12      A      Definitely.
13      Q      Did you become employed after you received
14 your degree?
15      A      Yes.
16      Q      And when was that?
17      A      It was from August to February.
18      Q      And what year?
19      A      2022 to 2023.
20      Q      And are you still -- where were you
21 working?  Where did you get hired?
22      A      I was working in Charlotte, but because of
23 the commute, I decided to resign and look for
24 something closer.
25      Q      So you were commuting from Concord to
```

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23


Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 71 of 126

1  Charlotte, is that correct?

2      **A**    Yes.

3      **Q**    So you voluntarily left that position in

4  February of 2023?

5      **A**    Yes.

6      **Q**    Have you been searching for employment

7  since that time?

8      **A**    Yes.

9      **Q**    Are you doing any other work?

10     **A**    No.

11     **Q**    You and your dad have lived together

12 during that time.  Do you know whether he works?

13     **A**    He is on disability.

14     **Q**    And do you know what the nature of that

15 disability is?

16     **A**    He hurt his back.

17     **Q**    Was that a car accident?

18     **A**    Yes.

19     **Q**    And does he receive disability as a part

20 of -- you know, because of the accident?

21     **A**    Yes.

22     **Q**    Is that -- during the time that -- since

23 you've come out of work, have you been able

24 to -- you have been able to pay bills and, you know,

25 sort of pay for the expenses of day-to-day living?

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 72 of 126

1     **A**     Definitely.

2     **Q**     How would you describe your relationship

3 with your father?

4     **A**     My father is a very caring, loving, and

5 respectable individual.  I have been with him ever

6 since I was born, and he has always been there for

7 me and he has always cared for me.  I know that I

8 can trust him and I love him as well and he is

9 always there for me.  He cares for me and I know

10 that I can survive and that he can survive with me

11 and I with him.

12     **Q**     Now you are aware of your father's arrest

13 last week, is that correct?

14     **A**     Yes.

15     **Q**     You know that he has been in jail since

16 that time?

17     **A**     Yes.

18     **Q**     Have you and I reviewed some of the

19 requirements that might be required of your dad

20 should the Court grant pretrial release?

21     **A**     Yes.

22     **Q**     It was noted in the bail report, that you

23 suffer from anxiety.  Could you just tell the Court

24 a little bit about whether or not that is true?

25     **A**     That is not true.  I'm not sure why that

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 73 of 126

1  was alleged on me.  I have never been to a mental

2  health doctor, nor diagnosed with any mental health

3  disorders, so that is false.

4       **Q**    Do you know why it would have said in the

5  report that you were irresponsible?

6       **A**    I don't know.  You can ask any person that

7  I know, they always would tell you that I'm

8  responsible.  I'm always positive, I'm nice, I'm

9  kind.

10      **Q**    And you completed college?

11      **A**    Yes.

12      **Q**    Got a certification?

13      **A**    Yes.

14      **Q**    And you've actively been seeking

15 employment, is that correct?

16      **A**    That's correct.

17      **Q**    When you spoke with the probation officer

18 that prepared the pretrial report, did you two

19 discuss the duties of a third-party custodian?

20      **A**    Yes.

21      **Q**    You understand that you would

22 become -- have some responsibilities, isn't that

23 correct?

24      **A**    That's correct.

25      **Q**    And part of that would be to make sure

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 74 of 126

1 that your father abides by all of the terms and

2 conditions of pretrial release?

3     **A**    Yes.

4     **Q**    Did you and I review those conditions?

5     **A**    Yes.

6     **Q**    And that you would be responsible if you

7 found that he wasn't abiding by those terms and

8 conditions, it would be your responsibility to

9 report that, is that correct?

10     **A**    That's correct.

11     **Q**    Are those obligations that you are willing

12 to take on?

13     **A**    Yes.

14     **Q**    And to make sure that your dad complies

15 with every term and condition?

16     **A**    Definitely.

17     **Q**    Now even though you're his daughter and

18 you're young, do you feel that you have the

19 fortitude, if there is a problem, to address it, as

20 you agreed to do before the Court in being a

21 third-party custodian?

22     **A**    Yes.  I have always been a strong and

23 dedicated individual, and I am able to comply with

24 this.

25     **Q**    Now one of the conditions would be that he

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 75 of 126

1 would be on home incarceration, and that would mean

2 he would be locked-down to the house.  Did we

3 discuss that?

4       **A**    Yes.

5       **Q**    And you understand, don't you, that he

6 couldn't leave the house except for very few

7 exceptions, such as doctor's appointments, meeting

8 with the attorney or court.  Is that your

9 understanding?

10       **A**    Yes.

11       **Q**    So if your father needs something from the

12 grocery store or pick up, you know, a household item

13 or something from the drug store, is that something

14 that you are willing to support him and do for him?

15       **A**    Definitely.

16       **Q**    Did we also review that a part of the

17 conditions would be electronic monitoring?  Did you

18 see that?

19       **A**    Yes.

20       **Q**    And as a part of that, your dad would be

21 required to wear the monitor and be accountable for

22 that monitor.  Is that your understanding?

23       **A**    Yes.

24       **Q**    And are those obligations something that

25 you're willing to support, oversee, and make sure

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 76 of 126

 1  that he follows those recommendations?

 2      **A**    Yes.

 3      **Q**    Let me just say, do you believe he is

 4  capable of following those recommendations?

 5      **A**    Definitely.

 6      **Q**    Do you think he needs you to watch over

 7  him?

 8      **A**    No.

 9      **Q**    But you're willing to do that, is that

10  correct?

11      **A**    Yes.

12      **Q**    And the final recommendation was that

13  there would no internet, no social media, no

14  computer accessibility for your dad.  You saw that,

15  right?

16      **A**    Yes.

17      **Q**    And being 21, I understand that that's a

18  big deal for people in your age group, but is that

19  something you're willing to forego over the next

20  several months if your dad is granted pretrial

21  release?

22      **A**    Definitely.

23      **Q**    Now you were here during the hearing,

24  testimony earlier?

25      **A**    Yes.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 77 of 126

1    **Q**    And so you saw testimony about items in

2    the house that could be considered contraband,

3    correct?

4    **A**    Yes.

5    **Q**    Are those items that you're willing to

6    have removed from the house if there is anything

7    left?

8    **A**    Yes.

9    **Q**    And if the Judge, Judge Webster were to

10    say nothing like that could be in the house, would

11    that be something that you would be willing to be

12    vigilant about in terms of making sure it wasn't in

13    the house, removing it, or even contacting probation

14    if you saw something like that that came in that you

15    had never seen before?

16    **A**    Definitely.

17    **Q**    Tell the Court, though, your belief about

18    your dad's ability to follow all of those

19    requirements?

20    **A**    My father will follow all of those

21    requirements.  He is responsible, and I know that he

22    will do it.

23    **Q**    And do you pledge to help him in any way

24    that he needs to successfully fulfill all of the

25    requirements of pretrial release?

UNITED STATES vs. MARIAN HUDAK    1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 78 of 126

1    **A**    Yes.

2         **MS. COSTNER:**  That's all the questions I

3    have.

4         **THE WITNESS:**  Thank you.

5         **THE COURT:**  Cross.

6         **MS. McFADDEN:**  Just briefly, Your Honor.

7                    **CROSS-EXAMINATION**

8    **BY MS. McFADDEN:**

9    **Q**    Ms. Hudak, you were at the residence last

10   week when it was searched, is that right?

11   **A**    Yes.

12   **Q**    And you met Special Agent Franks?

13   **A**    Yes.

14   **Q**    And she gave you her contact information?

15   **A**    Yes.

16   **Q**    She returned your phone to you, actually,

17   a couple of days ago?

18   **A**    Yes.

19   **Q**    Do you recall leaving a voice-mail on

20   Special Agent Franks' cell phone last evening about

21   this case?

22   **A**    Yes.

23   **Q**    Do you recall telling her that your father

24   was setup?

25   **A**    Yes.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 79 of 126

1    **Q**    Do you recall telling her that she

2  believes the lies of the illegal Mexicans?

3    **A**    Yes.

4    **Q**    Now in terms of your work situation, how

5  long was your commute when you were working your job

6  in Charlotte?

7    **A**    Fifteen minutes, sometimes an hour with

8  traffic.

9    **Q**    And it is your testimony under oath, that

10 you resigned from that job, not that you were let

11 go, is that correct?

12   **A**    Yes.

13   **Q**    Would it surprise you that your father

14 told agents after he was arrested, you were actually

15 let go from that job?

16   **A**    Say that again.

17   **Q**    Would it surprise you to learn that your

18 father told agents after he was arrested, that you

19 were let go from that job?

20   **A**    Yes, because I resigned.

21   **Q**    So it is still your testimony that you

22 resigned?

23   **A**    Yes.

24   **Q**    Prior to your father being placed on state

25 probation, did he have firearms in the home?

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

```
 1      A      No.
 2      Q      You've never seen a firearm in your
 3 father's home before, is that correct?
 4      A      Yes.  There was before probation, yes.
 5      Q      Do you recall what kind of firearms?
 6      A      Like AR-15 and like handguns.  A handgun.
 7      Q      Do you recall approximately how many?
 8      A      No.
 9      Q      Do you recall where he kept them in the
10 home?
11      A      In his room.
12      Q      Is there a lock on his door?
13      A      Yes.
14      Q      Did he ever leave his room unlocked?
15      A      No.
16      Q      In terms of your current work situation,
17 you're not bringing in any income, is that correct?
18      A      No.
19      Q      Who pays the bills for the house?
20      A      My father.
21      Q      And you have a cell phone, right?
22      A      Yes.
23      Q      Who pays the bills for your cell phone?
24      A      My father.
25      Q      And do you have a car to drive?
```

```
 1      A    Yes.

 2      Q    Who pays for the insurance for the

 3 vehicle?

 4      A    My father.

 5      Q    Who pays for the gas for that vehicle?

 6      A    My father.

 7      Q    Do you have health insurance?

 8      A    Yes.

 9      Q    Who pays the premiums for your health

10 insurance?

11      A    I have Medicaid.

12           MS. McFADDEN:  I have no further

13      questions, Your Honor.

14           MS. COSTNER:  Just a couple, Your Honor.

15           THE COURT:  All right.

16                    REDIRECT EXAMINATION

17 BY MS. COSTNER:

18      Q    Ms. Hudak, you were asked about the

19 voice-mail that you left for the agent.  Now despite

20 your feelings about whether or not your father is

21 guilty of these charges, does that impact your

22 commitment to abiding by any terms of pretrial

23 release that are set by Judge Webster?

24      A    No.

25      Q    And you can set aside your feelings about
```

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 82 of 126

1 whether or not your dad could be convicted of those

2 charges, and make sure that he is successful and to

3 assist him in being successful on pretrial release?

4 **A** Yes.

5 **Q** And if one of those conditions is he stays

6 off of Facebook or something like that, you're

7 willing to not have internet, not have access to

8 Facebook, and make sure that that is not a part of

9 what is going on in your house or what is available

10 in your home, is that correct?

11 **A** Yes.

12 **Q** You were asked about whether your dad told

13 agents that you were let go from your job.  What is

14 your dad's country of origin?

15 **A** Slovakia.

16 **Q** Does he speak that language?

17 **A** Yes.

18 **Q** And are there times language is a barrier,

19 you know, struggles where your dad is concerned?

20 **A** Yes.

21 **Q** Is there a possibility that your dad was

22 trying to communicate that you left your job but may

23 have mistakenly communicated that you were let go of

24 your job?

25 **A** Yes.  He knows that I resigned.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1    **Q**    Did you give notice at your job?

2    **A**    Yes.

3    **Q**    How much notice did you give?

4    **A**    Thirty days.

5    **Q**    With respect to the questions about -- so

6    you testified that your dad's bedroom door was

7    locked.  No access to either of the firearms for

8    anybody except your dad, is that correct?

9    **A**    Yes.

10   **Q**    And you were asked about the finance

11   situation in your home.  Your father receives a

12   disability check, doesn't he?

13   **A**    Yes.

14   **Q**    While you were working and receiving an

15   income, did you help contribute to the household

16   expenses?

17   **A**    Definitely.

18   **Q**    Was that something that if you were to get

19   a job you would expect to do in the future?

20   **A**    Definitely.

21   **Q**    But at this point in time, you are not

22   working, you are able to be home with your dad and

23   able to serve as a third-party custodian almost on a

24   24/7 basis, isn't that correct?

25   **A**    Correct.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 84 of 126

1          **MS. COSTNER:**  That's all of the questions

2     I have.

3          **THE COURT:**  You said that the agent was

4     believing -- I didn't take the note down

5     completely, were believing what the illegal

6     Mexicans had said.  How do know they were all

7     illegal?

8          **THE WITNESS:**  Well, I don't know that for

9     a fact, like if it's true, but I do think it

10    is, because Abby Duarte does have a fiancee,

11    Ray David Martinez Santos, who does not speak

12    Spanish, and she also assumed that we were

13    illegals, and told my father to go back to

14    Russia.  She has called me multiple names,

15    harassed me.  And her husband illegally pointed

16    a loaded handgun on my father.

17         **THE COURT:**  There is something in the

18    report here about the passport being in a safe

19    at his wife's residence, and that she was not

20    going to let the -- I guess is that your mother

21    or the --

22         **THE WITNESS:**  Yes, my mom.

23         **THE COURT:**  Won't let anybody come in to

24    get it.  Is that the case?

25         **THE WITNESS:**  I mean, that's what she told

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO  Document 21  Filed 07/18/23  Page 85 of 126

1    me, but if you were to come, I believe she

2    would let you in and retrieve the passport.

3         **THE COURT:** Did you hear all of the

4    evidence today?

5         **THE WITNESS:** Yes.

6         **THE COURT:** I heard some evidence to the

7    fact that when the police came on the scene,

8    your dad was allegedly -- I can't remember

9    exactly, was it using the N word or using -- or

10   hollering something? Do you remember what that

11   was?

12        **MS. McFADDEN:** There were multiple

13   occasions of that, Your Honor.

14        **THE COURT:** But with the police?

15        **MS. McFADDEN:** Yes. I believe the

16   police -- you may be referring to the incident

17   at the Sam's Club, when he was broadcasting.

18        **THE COURT:** And I'm just trying to -- I'm

19   trying to compare that, or contrast that with

20   your description of him as very caring, loving

21   and respectful person. And then you said

22   responsible. I'm just trying to wrap my head

23   around how all of those things could be true if

24   the alleged -- if the facts that I've heard

25   today are true.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO  Document 21  Filed 07/18/23  Page 86 of 126

1           **THE WITNESS:**  Your Honor, a lot of people

2       that were producing video today, like J.S. and

3       I'm not sure of the other initials, Abby

4       Duarte, they have reported a lot of false

5       allegations towards my father, and they have

6       started the problems.

7           My neighbor has always harassed me.  She

8       called me a bitch, and I have never heard my

9       father ever calling somebody the N word,

10      threatening, ever using weapons of any kind

11      towards anybody.  If anything, weapons were

12      always pointed at him, like the guy at the

13      apartment complex, when my father went there,

14      he hopped out of the car -- popped out of his

15      sports car, which I do have a video of, it's

16      evidence, that he pointed a rifle at him, and

17      his girlfriend, I'm assuming, sped away.  So

18      they have always flipped him off.  Always have

19      cursed him out, and just to get on his nerves

20      and cause problems, because I guess they are

21      against what my father stands for and they

22      don't want him representing his freedom.

23          **THE COURT:**  If I ask a question, you all

24      can -- either, both sides can follow up.

25          **MS. McFADDEN:**  I have nothing further,

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 87 of 126

1     Your Honor.

2            **MS. COSTNER:**  I have just a couple, Your

3     Honor.

4                      **FURTHER EXAMINATION**

5     **BY MS. COSTNER:**

6     **Q**     You were asked questions about your

7     neighbors and why you think that they are illegal

8     and then about the other folks, your father's

9     language.  If your father is allowed out on pretrial

10    release, do you believe that you and he can, you

11    know, ignore the neighbors, regardless of what they

12    say or you say or anything like that, and abide by

13    the Court's order?

14    **A**     Yes.

15    **Q**     You would do that?

16    **A**     My father doesn't even -- like before all

17    of this --

18    **Q**     Let me interrupt you for a minute, because

19    what I'm trying to -- I'm not trying to -- I'm

20    talking about if the Court orders and allows your

21    dad to come home, he will be under home

22    incarceration, is that correct, you understand?

23    **A**     Yes.

24    **Q**     So he wouldn't be coming out of the house.

25    **A**     Yes.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 88 of 126

```
 1     Q    He might come out of the house on
 2 occasion.
 3     A    Yes.
 4     Q    You are able to go get in your car and go
 5 do what you need to do and come back?
 6     A    Definitely.
 7     Q    And you would support your father, the
 8 efforts and the orders that your father must follow
 9 where all of that is concerned, is that correct?
10     A    Yes.
11     Q    And with respect to -- you were asked
12 about the passport.  Now Judge Webster probably
13 wouldn't go get the passport, but if a United States
14 Probation Officer went to your mother's house and
15 requested that passport, do you believe your mother
16 will give the passport?
17     A    Yes.
18          MS. COSTNER:  That's all the questions I
19     have.
20          THE COURT:  As to that question, we have
21     in here that your father was the only one who
22     knew how to use -- would be able to get into
23     the safe or something.
24          THE WITNESS:  Yes.  It is in a safe.  And,
25     yes, sir, he can only get into it.
```

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1    **MS. COSTNER:**  Do you mind if I ask one
2    quick follow-up?  Do you believe your father
3    would give you the combination?
4        **THE WITNESS:**  Yes.
5        **THE COURT:**  Any further questions of this
6    witness?
7        **MS. McFADDEN:**  Nothing from the United
8    States, Your Honor.
9        **MS. COSTNER:**  No, Your Honor.
10       **THE COURT:**  You may step down.
11       Further evidence for the defendant?
12       **MS. COSTNER:**  No, Your Honor.
13       **THE COURT:**  All right.  I'll hear from the
14   defense first.
15       **MS. COSTNER:**  Your Honor, do you want me
16   to address both the probable cause and the
17   detention hearing or one and one or -- I don't
18   know how the Court wants to do that.
19       **THE COURT:**  I guess maybe I
20   misinterpreted, I thought that you were not
21   conceding probable cause.
22       **MS. COSTNER:**  No, Your Honor.
23       **THE COURT:**  I'll hear you on both.
24       **MS. COSTNER:**  I'll address the probable
25   cause first.  Your Honor, certainly I

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO  Document 21  Filed 07/18/23  Page 90 of 126

1    understand the low threshold that dictates to

2    find probable cause, and just would submit a

3    couple of things for the Court to consider.

4        Your Honor, first of all, with

5    respect -- I looked at both statutes, and under

6    18 U.S.C. 245(b)(2)(B), it says by force or

7    threat willfully injures, intimidates or

8    interferes with or attempts to injure,

9    intimidate or interfere with any person

10   because of his race, color, religion or

11   national origin, and I'm going to highlight

12   this, because he is or has been participating

13   or enjoying any benefit, service, privilege,

14   program, facility actively provided or

15   administrated by any state or subdivision

16   thereof.

17       And, Your Honor, I would just say even in

18   the light most favorable to the Government, the

19   Court heard no evidence that any interaction

20   between my client and J.S. was because he was

21   enjoying the benefit, and I'm assuming that the

22   Government means riding on the road.  They have

23   not linked up any alleged behavior with that,

24   that it happened because this person was

25   riding --

UNITED STATES vs. MARIAN HUDAK    1:23CR231
Preliminary Examination & Detention 6/26/23


Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 91 of 126

1          **THE COURT:**  What would be an example of

2     a -- because of using the road?

3          **MS. COSTNER:**  That's a good question, Your

4     Honor.  I would -- so, first of all, I would

5     say that this situation appears to be sort of a

6     road rage, and I'm not sure what happened, and

7     I don't know that any of us know what happened.

8     We did hear evidence that J.S. knew of my

9     client, but there had at least maybe been some

10    interaction that he noticed the car and he was

11    looking at the car, but there is no evidence

12    that anything that my client did was intended

13    to prevent him from riding on the road.  They

14    both were on the road.  They both exited off

15    the road.  They stopped at a stop sign, and

16    from what it sounds like is, J.S. had a

17    firearm.

18          Now, there is no question as to whether he

19    actively pointed it at that point or not.  They

20    go to the apartment complex.  I didn't hear any

21    evidence that any of the parking area of the

22    apartment complex falls within activity

23    provided or administered by any state or

24    subdivision of the state, so I didn't hear any

25    evidence about that part of the altercation

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 92 of 126

1    that it occurred in that area.

2        So when I look at it, Your Honor, I see

3    two people riding down the road engaging in

4    some type of, you know, action, road rage type,

5    stopping at a stop sign and then continuing on.

6        So when I look at the statute, and I

7    examine it with the evidence that the Court

8    heard, I would just contend that they have not,

9    even with the very low threshold that the

10   Government has, they really haven't established

11   as to why this happened, and what they have to

12   show is that it happened because the person,

13   the victim, J.S. is or has been, you know,

14   participating or enjoying in this benefit, so

15   that causal relationship was not established.

16       What would be, Your Honor, maybe a

17   roadblock, where the roadblock is clearly

18   somebody like, you know, and I'm -- I

19   understand the Court heard something about a

20   roadblock in the apartment complex but, again,

21   Your Honor, there is no evidence that that part

22   of the complex is a state managed or

23   administered area, and so perhaps on a public

24   road some people put up a roadblock that is

25   clearly racist or interfering with, you know,

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 93 of 126

1    or directed it towards people of color or

2    national origin or something, and refusing it

3    at that point, maybe letting only people that

4    they believe should pass come and go through,

5    and making the other folks turnaround and go.

6        I mean, that's just an example that comes

7    off the top of my head, Your Honor, but that's

8    not what happened here.  What happened here is,

9    two people that apparently had had some

10   interaction in the past, were driving down the

11   road and if -- you know, this is what Mr. Hudak

12   is alleged to have said.  I mean,

13   unfortunately --  I mean, it is not illegal for

14   him to say it, and we also don't know what was

15   said back, because J.S. certainly didn't admit

16   to any behavior on his own, except that he had

17   firearms.  He had a firearm in his car and what

18   did he ask for in this parking lot?  He asked

19   for his assault rifle.  And you heard no

20   evidence of a firearm on the part of Mr. Hudak.

21   What you heard was, we didn't do a real good

22   search.

23       Well, I guess, Your Honor, I would just

24   say, if there was really good strong evidence

25   and a belief that somebody had pointed a

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23


Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 94 of 126

1    firearm at three people and threatened to kill

2    them, that there would be a pretty thorough

3    search of that car, and it wouldn't just be,

4    oh, well, there is a lot of stuff in this car,

5    and I just can't really tell.  I mean, that to

6    me, is just completely unreasonable, Your

7    Honor.

8         There was no firearm found because there

9    was no firearm in his car.  So that's what I

10   would say as to the first charge, Your Honor.

11        With respect to the second, this

12   altercation, you know, with the neighbors.  You

13   know, again, whoever -- whether or not acting

14   under color of law by force or threat,

15   willfully injures or interferes with or

16   attempts to injure, intimidate or interfere

17   with any person because of race, color,

18   religion, sex, handicap, national origin, and

19   because he is or has been, and I'm just going

20   to jump to occupying any dwelling.

21        So first, Your Honor heard no evidence

22   that this was in fact the dwelling of the

23   neighbors next door.  You heard, well, the

24   Duartes were there and there was this

25   altercation.  Really, the evidence you heard

UNITED STATES vs. MARIAN HUDAK    1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 95 of 126

1     is, that these folks, especially this one

2     person on this occasion pulled in and Mr. Hudak

3     came out and said, your headlights are -- my

4     daughter can't sleep, and that caused the

5     argument.  And, Your Honor, that's not the type

6     of argument or altercation that's called for in

7     that statute.  That's, you're interfering with

8     my ability, you know, my children to sleep.

9     And, Your Honor, just kind of our experience in

10    life, those kinds of altercations happen in the

11    regular experience in life.  They are not

12    great.  We hope they don't.  But who invited

13    who to fight?  You heard the evidence.  The

14    neighbor invited and brought on the fight, and

15    then when the fight wasn't going so well, the

16    neighbor got a shotgun and pointed it at

17    Mr. Hudak, and that's what started the

18    altercation.

19         You did hear evidence of some very

20    unpleasant things that were said, very racist

21    or --

22        **THE COURT:**  Do you contend that the

23    evidence I heard was, that he referred to

24    persons of color with the N word?

25        **MS. COSTNER:**  He did.

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 96 of 126

1      **THE COURT:**  Do you not believe that

2      invites someone to fight?

3          **MS. COSTNER:**  Well, Your Honor, first of

4      all, maybe I don't understand your question.

5      Do you mind repeating it?

6          **THE COURT:**  Calling someone the N word, is

7      there law or anything that says whether that is

8      or is not fighting words?

9          **MS. COSTNER:**  I don't know of a law that

10     says that, if what we are talking about is the

11     legal framework of this.

12          Now whether that's -- I mean, there are

13     all kinds of other ways we can judge those

14     words, but if we are looking at an application

15     of these statutes to his actions then, you

16     know, despite what our personal feelings might

17     or might not be about those words, I cannot

18     find support for the fact that it is illegal to

19     say them, and especially when we're looking at

20     the context of this statute and, again, we get

21     to -- so you've got the first part of the

22     statute with respect to the neighbor and the

23     enjoyment of the --

24          **THE COURT:**  Do you have a copy of the

25     statute?

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 97 of 126

1    **MS. COSTNER:** Yes, Your Honor, I do. I
2    can pull it up. I have both to hand up. If I
3    may approach.
4        **THE COURT:** You may.
5        **MS. COSTNER:** Does Your Honor want me to
6    wait a minute for the Court to --
7        **THE COURT:** No, you can go on.
8        **MS. COSTNER:** Thank you, Your Honor. When
9    you look at 42 U.S.C. 3631, again, you have,
10   "and because." The actions have to be because
11   this person is occupying this house. So,
12   again, Your Honor, even under this very --
13       **THE COURT:** Is there a law or anything
14   that says whether that is or is not fighting
15   words?
16       **MS. COSTNER:** Again, you have, "and
17   because." So the actions have to be because
18   the person, the victim, is occupying this
19   house. And again, Your Honor, even under this
20   very relaxed standard that the Court has to
21   look at, I would just contend that there is no
22   evidence that this altercation or this -- what
23   is charged is because these people are
24   occupying the house. They were neighbors.
25   They do occupy the house.

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 98 of 126

1           If the Court believes there was sufficient

2     evidence to show that and, again, I'm not

3     conceding one bit, but did the actions that

4     Mr. Hudak is alleged to have committed rise to

5     the level of this crime, was it because they

6     lived there?  Is it because some bad blood

7     started when the male victim, I don't know,

8     Mr. Duarte, whoever, pulled in and began to

9     shine the lights in the house and that caused

10    the fight, which then led to the firearm, which

11    then led to further bad blood?

12          Your Honor, they present evidence that

13    shows -- so what do we see?  We see, first of

14    all, there is the social media.  Well, Your

15    Honor heard, yes, Mr. Hudak posted about his

16    dislike for his neighbors.  I mean, he did.

17    You saw what he posted.

18          There is no evidence that this was

19    something that the neighbors saw, Facebook

20    friends that he was directing it to them, that

21    he was making threats.  He was venting and

22    saying things that weren't very nice.  I mean,

23    I can't say that otherwise.

24          You know, I believe that -- or I would

25    contend that the neighbor started this with the

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 99 of 126

1        pointing of the firearm.

2              Your Honor saw -- Your Honor heard, when I

3        asked, well, my client didn't pull a gun and

4        we've heard about these other bad acts as well

5        that they want to sort of pile on.  He's out

6        there.  He's saying things that, you know,

7        are -- I mean, socially unacceptable.  Are they

8        illegal?  No.  I mean, in that context.

9              When he was asked to leave Sam's Club, for

10       example, he left.  They didn't want him there

11       saying those things.  He wasn't arrested, Your

12       Honor.  He didn't have a firearm.  He wasn't

13       pulling knives on people.  You didn't hear any

14       evidence at all about him pulling, you know,

15       weapons, hurting people, you know, or shooting

16       at people, threatening to shoot people.

17             You saw all of the things in his house.

18       That may be of concern to the Court, having

19       swastikas, having those types of things may

20       well give Your Honor concern, but what did you

21       also hear from the agent?  She couldn't tell

22       you where they came from.  For all we know,

23       they're in a den in a collector's bin.  They

24       are in a room.  They are --

25             **THE COURT:**  I was trying to understand

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23


Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 100 of 126

1    your argument about that.  What difference does

2    it make that they have been in a bin or in a

3    closet?  The fact that, I think, the Government

4    is trying to point out is, that they were in

5    his home.

6        **MS. COSTNER:**  I understand that, Your

7    Honor, and you are allowed by law to collect

8    all kinds of things.  Again, I'm not arguing

9    the moral high ground of collecting items like

10   that.  What I'm saying, Your Honor, is that if

11   he collects them, and he keeps them in his

12   home -- and I asked the agent, did you see him

13   wearing these things?  Is he displaying these

14   things?  Is he -- you know, I mean, all of

15   these items that they found, is he wearing a

16   Secret Service badge?  Is he wearing a police

17   badge that you found in there?  Is he -- you

18   know, is he threatening people with these

19   items?  And, they are in his home.

20       I would just pose the question, how does

21   that support an argument that he is guilty or

22   that they have probable cause to meet the

23   definition of these two statutes?  You don't

24   hear from J.S. or from the neighbor that he

25   somehow put on a badge and ran out there or

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1    that he hit somebody with one of these iron

2    cross rings that they are making a big deal

3    about.  All of these items are, again, in his

4    home.  They are not outside.

5         So, Your Honor, I think I just would

6    contend when you look at the statutes

7    themselves, and I just reiterate that the big

8    problem that they have and I would contend that

9    it should - the Court should not find probable

10   cause.  They cannot tie the behavior to the

11   next card, because J.S. was on the road,

12   because the Duartes live in the house, and they

13   have to make that causal connection for them to

14   go forward with this case, and I would just ask

15   Your Honor to find no probable cause for both

16   of those charges.

17        **THE COURT:**  You may proceed.

18        **MS. COSTNER:**  Your Honor, with respect to

19   detention, I sort of mentioned a lot of what

20   the Court has already heard, but the

21   recommendations are pretty stringent.  The

22   recommendations from probation are for home

23   incarceration.  He would not be permitted to

24   leave the house except for medical emergencies,

25   except to meet with his probation officer,

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 102 of 126

1     except to go to court.  He would be able to
2     come and meet with me.
3          Your Honor, even though there is some
4     potential issues at least expressed in the bail
5     report, you have been able to hear from his
6     daughter, and that she is educated.  She's done
7     well in school.  She's worked.
8          **THE COURT:**  Would you admit that she is
9     vindicated through her testimony and by the
10     call to the agent?  Can I suppose most of the
11     people who come through here who are family
12     members and girlfriend, boyfriend, mother,
13     aunt, whatever -- the daughter, that she
14     allegedly made to the officer and the statement
15     that she finds no -- you know, finds no fault
16     in her father?
17          **MS. COSTNER:**  Well, daughters love their
18     dads and I will say that, Your Honor --
19          **THE COURT:**  I have two daughters, two
20     grown daughters myself, and they probably may
21     not find any fault in me, even though I know
22     that I have faults like every human being.
23          **MS. COSTNER:**  Yes.
24          **THE COURT:**  So that's the part that
25     bothers me a little bit is, she didn't see that

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 103 of 126

1      he's done anything even morally wrong.

2           **MS. COSTNER:**  I have been doing this a

3      very long time, Your Honor, and it is my

4      experience, that many people that are out on

5      pretrial release who have third-party

6      custodians in mothers, girlfriends, wives, not

7      often daughters but, you know, but sometimes

8      family is family, and they are going to support

9      their family through thick and thin, until

10     otherwise.  But that is one bucket.

11          The other bucket is this, Your Honor.

12     What is her obligation as a third-party

13     custodian and living in that home and she is

14     aware of the consequences of not acting and

15     taking on the duties of a third-party

16     custodian, and she understands what her father

17     is going to be ordered to do to remain in the

18     house 24/7, to wear an ankle monitor and keep

19     it charged and abide by all of those

20     requirements, to get rid of the internet, to

21     get rid of Facebook or all of the -- you know,

22     all the social media.  And in that case, it is

23     going to have to go for her, too, because you

24     can't have Wi-Fi in the house that only one

25     person can access.

UNITED STATES vs. MARIAN HUDAK    1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 104 of 126

1     I'm assuming, you know, of course I

2     haven't met with probation, but I have sat down

3     with her, Your Honor, and I very carefully

4     explained to her every single duty, every

5     obligation that Mr. Hudak would have and the

6     ramifications of that requirement of no

7     internet, no social media.  She understands

8     that.  And for a 21-year-old, that's a tough

9     one, but she is willing to do every bit of

10    that, and she understands that he is going to

11    be monitored, that people are going to be --

12    you know, the probation office will be in her

13    home monitoring this.

14    I told her that most likely, law

15    enforcement are going to be monitoring, to see

16    if he is out there posting on Facebook or what

17    is being said.  It won't be just probation.

18    She knows that as well, and Mr. Hudak knows

19    that, even more importantly.

20    She is willing to support her father in

21    this.  Mr. Hudak is willing to abide by every

22    condition.  And, Your Honor, should there be a

23    violation, I don't believe there would be, but

24    there are consequences.  I mean, there would be

25    other opportunity, and I've made that very

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 105 of 126

1 clear to both of them that any misstep is going

2 to result in him being placed in custody in

3 jail, and they are both willing.

4  So regardless of maybe her personal

5 feelings about her father and whether or not

6 she believes he's done anything wrong, she

7 fully accepts the requirements that have been

8 laid out, and the recommendations that have

9 been laid out. She has no hesitation.

10  You heard her testify about all of that,

11 Your Honor. When I met with her, there was no

12 argument about that. It was, I will do those

13 things. I am willing to report him if he

14 doesn't, but I believe my dad will do those

15 things.

16  I've talked with Mr. Hudak. He's

17 committed to following everything that the

18 Court orders, and his home is going to be open

19 to inspection. And so I would just -- Your

20 Honor, in terms of -- I'm not going to go over

21 all of the things about what I had to say sort

22 of woven into the preliminary --

23  **THE COURT:** When is he due in District

24 Court?

25  **MS. COSTNER:** In District Court now?

UNITED STATES vs. MARIAN HUDAK 1:23CR231
Preliminary Examination & Detention 6/26/23

1      **THE COURT:**  When is --

2      **MS. COSTNER:**  I mean, so this is -- are

3  you talking about the complaint?  You mean with

4  his state charges?  I'm not sure -- I don't

5  understand the question.

6      **THE COURT:**  At some point he's going -- if

7  I were to find probable cause, he's going to be

8  before a District Judge at some point, right?

9      **MS. COSTNER:**  Yes, Your Honor.

10      **THE COURT:**  That's what I am asking, when

11  is that?

12      **MS. COSTNER:**  The Government would have to

13  indict.

14      **MS. McFADDEN:**  We'll be presenting an

15  indictment to the grand jury and his

16  arraignment would be calendared as soon as any

17  return was made.  So there is no date just yet.

18      I will note for the Court, that the grand

19  jury is convening this week.

20      **THE COURT:**  Thank you.

21      **MS. COSTNER:**  So, Your Honor, I think I

22  was much more able to present a timetable.  I

23  have given him sort of a forecast of the

24  timetable because I didn't know when the

25  Government was going to the grand jury.

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 107 of 126

1       He understands this would be for several

2   months, you know, potentially.  So does his

3   daughter.  They both understand that, and they

4   are absolutely willing to follow the

5   Court's -- if the Court is willing to give him

6   pretrial release, every condition.  If the

7   Court wants to come up with other conditions

8   that Your Honor feels would be appropriate

9   here, then they will follow those conditions,

10  and I feel they have insured me that they will

11  comply and will not be back before this Court

12  on any type of a violation.

13      So, Your Honor, I ask the Court

14  to -- you've heard the evidence.  You've heard

15  my cross-examination, what I had to say about

16  the sufficiency, and I am not going to repeat a

17  lot of that for the Court, but I believe I

18  would say that a lot of that also bears on,

19  again, the strength --

20      **THE COURT:**  You are not finding any cases

21  that interpret these statutes that you could

22  have handed up to the Court?

23      **MS. COSTNER:**  Your Honor, this case -- I

24  got it Thursday and, unfortunately, Your Honor,

25  was -- this hearing came very quickly.  I was

UNITED STATES vs. MARIAN HUDAK    1:23CR231
Preliminary Examination & Detention 6/26/23

1    not able to do the research.  I found one case

2    that it really wasn't on point and so I have

3    not really found -- but I have not had the

4    opportunity to do the research, just due

5    to -- and I'm not a dodging my homework kind of

6    person, but I had travel plans and was not able

7    to do the research that I would need.

8        I'm happy to do that and submit to the

9    Court with a memorandum.  If the Court wanted

10   that, I'm happy to do that.

11       **THE COURT:**  I think I would.  You've

12   raised points about the statute.  This is

13   certainly the first case of -- or first

14   impression with this Judge, and it sounds like

15   you haven't had a dozen yourself, so.

16       **MS. COSTNER:**  This will be a first.

17       **THE COURT:**  I don't know about the

18   Government, but, I mean, it would be helpful to

19   me to, you know, see something before making a

20   decision.

21       **MS. COSTNER:**  Well, I would be happy, if

22   the Court would give me a day or two, I would

23   be happy to brief something and send it in.

24       **THE COURT:**  Let me ask probation, you've

25   made a recommendation to release him, and I see

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1    all of the conditions.  Is it in part because

2    of his -- I'm not going to say, no record.  I

3    mean, he certainly has some record here, but it

4    is not -- you know, he has not been convicted

5    of a lot of felonies like we often see and so

6    forth.

7         **THE PROBATION OFFICER:**  Your Honor, that's

8    one factor, the number of felony convictions,

9    or lack of felony convictions is one of many

10   different factors that go into that decision.

11   I can't point to one specific thing that pushed

12   the recommendation one way or the other, but

13   that was one factor, yes.

14        **THE COURT:**  Are you finished, Counsel?

15        **MS. COSTNER:**  Yes, Your Honor.

16        **THE COURT:**  All right.  I'll hear from

17   Ms. McFadden.

18        **MS. McFADDEN:**  Thank you, Your Honor.

19   First and foremost, in terms of my preparation

20   today, I'm a little bit caught and surprised

21   that probable cause is not being conceded on

22   the "but for" language, because I am not sure

23   the evidence could be stronger of the but for

24   language as to between Mr. Hudak's actions and

25   the victims that he selected.

1          The incident with J.S., was not a road

2     rage incident.  There was -- the instigating

3     event was that J.S. was black and he was

4     driving his car on the same road as Mr. Hudak,

5     and he made that abundantly clear when he got

6     out of his car and knocked on his window and

7     called him the N word and called him boy, and

8     in terms of interference with his right to the

9     roadways, I mean, the Court asked a great

10    question, what is an example, if not something

11    like this.

12         I mean, if you go back to, for instance,

13    if (indiscernible) is going to school people

14    could call her the N word and call her

15    derogatory slurs and they can yell and scream

16    at her, but unless they roadblock the school,

17    that's not interfering with her constitutional

18    right to attend school?

19         I mean, the argument that there is no

20    nexus between the racial animus and the actions

21    here is to completely ignore the history of

22    this country and the Civil Rights Act under

23    which these statutes were passed by Congress to

24    address these particular types of problems.

25         The incident with Mr. Duarte, if it had

UNITED STATES vs. MARIAN HUDAK    1:23CR231
Preliminary Examination & Detention 6/26/23

1    nothing to do with the fact that Mr. Duarte

2    appears Mexican, Mr. Hudak didn't even know if

3    he is or not, despite his assertions that he's

4    illegal.  Despite his daughter's assertions

5    that he's illegal, that's followed up with

6    "Idiots from Mexico in my neighborhood.

7    Illegal immigrants.  Mexican idiot asking for

8    trouble every single day.  Mexican cartel in

9    Concord, North Carolina, hate American people.

10   Shame on you.  Dirty money for walking free,

11   because Mexican cartel in my neighborhood lied

12   about me in court."  He could not make it

13   anymore clear the reason that this is

14   happening.

15        And, while it is almost impossible to

16   prove a negative, the Court hasn't heard any

17   evidence of the fact that he's also running

18   white drivers off the road and following them

19   to their apartment complexes.

20        There was a comment, then perhaps there

21   was -- not clear whether or not J.S. pointed a

22   gun.  There is no evidence that J.S. pointed

23   the gun.  There is evidence that he reached for

24   it, and if he did point a gun, why on the earth

25   would Mr. Hudak then follow him to his

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 112 of 126

1     apartment complex and block the road and

2     continue to yell at him and threaten him there?

3     It makes no sense.

4          The real common denominator between all of

5     these events is Mr. Hudack's involvement in

6     them, and the fact that people that are

7     targeted are of a minority, and that's what

8     these statutes are meant to address.

9          I'm happy to brief this for Your Honor,

10    but I will say for the record, that these types

11    of statutes cannot be charged by our office

12    without approval from Washington, specifically,

13    with the civil rights section.  They have to be

14    certified by the Associated Attorney General,

15    that's Kristen Clark, and they have a whole

16    team of lawyers whose job it is just to

17    research cases on these very issues, these very

18    legal issues.

19         So these charges aren't brought lightly

20    and they weren't brought lightly, and

21    they -- in light of the fact that the evidence

22    here is compelling that there is probable

23    cause, so I would ask the Court to make that

24    finding.

25         And to the extent that the Court wanted

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 113 of 126

1    any additional briefing, I would ask the Court

2    to stay such an order until the grand jury has

3    had an opportunity this week to review these

4    charges, because if they do return an

5    indictment, then the issue of probable cause is

6    muted at that point in time, because they have

7    found it.

8         In terms of detention, I respectfully

9    disagree with probation's recommendation.  I do

10   not think there are any conditions that can

11   safely assure the safety of the community or

12   prevent flight.

13        I just want to walk the Court through the

14   time line that we see reflected both in the

15   evidence that Agent Franks testified to and the

16   evidence that is in the pretrial services

17   report.

18        So on March 29th, 2021, there is a

19   misdemeanor conviction for DWI and carrying a

20   concealed gun after consuming alcohol.  That's

21   a danger to the community.

22        On November 27th, 2021, there is the

23   assault on Justin Duarte.  This is while he was

24   serving a term of probation related to the DUI.

25        That same month, November 10th, 2021, he

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1     has charges of illegal use of a red or blue

2     light and charges of impersonating a law

3     enforcement officer, which was dismissed.  The

4     other, he was convicted on.

5          On June 5th, 2022, he's arrested for

6     misdemeanor carrying concealed weapon.  That's

7     pending.

8          On July 2nd, 2022, after being arrested on

9     a different charge of injury to property, he

10     proceeds to talk to the arresting officer about

11     black people and Mexican people, oh, my God,

12     you know, the two very types of minorities that

13     were targeted and two charges in the criminal

14     complaint.

15          July 21st, 2022, that's the Sam's Club

16     incident.  Again, does he have a First

17     Amendment right to say these terrible things?

18     Absolutely.  But can the Court consider it as

19     evidence of bias and probable cause,

20     absolutely.

21          October 13th, 2022, this is the assault on

22     J.S.  He was arrested related to this.

23     Released on a promise to appear.

24          November 16th, 2022, convicted for injury

25     to personal property and simple assault.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 115 of 126

1      **THE COURT:** What was the 10/13/22, was

2    that -- I see that was voluntarily dismissed on

3    January 31st, 2023.

4      **MS. McFADDEN:** Your Honor, both J.S. and

5    Mr. Duarte did press charges through magistrate

6    warrants against Mr. Hudak. I would submit to

7    the Court that these are cases that the police

8    department ought to have arrested and brought

9    charges and the DA's office should have

10    addressed. They were put in the posture of

11    essentially having to prosecute.

12      There are no -- they are victims of hate

13    crimes. This is why this statute is so

14    important federally. But my understanding is,

15    that the reason why that was dismissed was

16    because J.S. did not appear at one of the

17    hearings.

18      Going back to the time line here, on

19    December 19th, 2022, he is violated for having

20    the fixed blades and not providing truthful

21    information to his probation officer.

22      On December 30th, 2022, there is an arrest

23    for misdemeanor disorderly conduct. He's

24    convicted for that in March of this year.

25      Then we get to January 2023, where we have

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 116 of 126

1    the postings that the Court saw.  These

2    publically filed posts, Exhibit 5, "Idiots from

3    Mexico."

4        Exhibit 6, "Mexican cartel in Concord,

5    North Carolina."

6        Exhibit 7, "I remember this because

7    Mexican cartel in my neighborhood lied about me

8    in court."

9        And between those two posts in six and

10   seven, is a charge January 18th, 2023, for

11   misdemeanor criminal contempt.

12       Moving forward to February, 2023, he's

13   charged with reckless driving to endanger.

14   That's pending.

15       On February 10th, 2023, we have the

16   recorded videos of the Duartes posted to

17   Facebook.  "She is a Mexican."

18       Then we have the no contact orders and the

19   contempt that he was found in by the Court

20   related to violating the no contact order.

21       Then we have Exhibits 10 and 11, the posts

22   of the lone wolf memes.  Perhaps there is a

23   plausible explanation for loving animals, but

24   when you look at these memes, coupled with

25   Mr. Hudak's violent behavior, his possession of

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 117 of 126

1    weapons, there is no way to ignore those and

2    there is no way to ignore a meme about killing

3    someone who threatens what he loves.

4        May 24th, 2023, he is convicted of

5    misdemeanor stalking. And finally, we have

6    June 22nd, which was the date of this search.

7        Again, it is not illegal to own these

8    items, but it is absolutely laughable to

9    suggest that he owned this Nazi flag, this KKK

10    flag, this iron cross ring, that horrible

11    pamphlet with the racial twerps because he is a

12    collector of items. Okay.

13        This is a smoking gun of evidence of

14    racial animus and it is the same racial animus

15    that fueled his attacks on the people that are

16    identified in the complaint.

17        So I understand this is the Government's

18    burden. Section 3142 asks the Court to

19    consider a number of factors in deciding

20    whether or not there are safe conditions.

21    Again, I submit that there is not.

22        When you look at the nature and

23    circumstances of the offense, this is not a

24    case about free speech. It is not a case about

25    collectables. It is a case about terrorizing

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

Case 1:23-cr-00231-WO  Document 21  Filed 07/18/23  Page 118 of 126

1    minorities.  It is legal to own Nazi

2    paraphernalia.  It is not legal to terrorize

3    people driving on the street.  It is not legal

4    to terrorize people who live next to you

5    because you don't like the color of their skin

6    or where you think they are from.  It is not

7    legal to attack them for those reasons.

8        There is nothing more serious than

9    targeting individuals for violence because of

10   these factors.  And this is not to mention that

11   the assault on J.S. involved the threatened use

12   of a firearm.

13       Now, we understand that there are some

14   facts about that that we may not know.  There

15   was a limited sweep of the car.  They didn't

16   find a firearm.  They didn't do a very thorough

17   search in the moment.  It could have been

18   there.  Three different witnesses saw that and

19   one of them was K.E., the woman who was

20   completely uninvolved, and not only did she see

21   it, she contemporaneously reported it in the

22   911 call.

23       But even if there wasn't one, there was

24   the threatened use of one, and that is

25   sufficient in terms of danger to the community.

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1          In terms of the strength of the evidence,

2     again, I would submit it is strong.  The video

3     evidence, both the ring camera at the Duarte's

4     home and the surveillance at the apartment

5     complex support the victims' accounts of what

6     occurred.

7          In terms of racial animus, I mean, it is

8     on his truck.  It is on his Facebook.  It is in

9     his home.  It is in the comments he makes to

10    police officers on a recorded body-worn camera

11    during these many arrests, and I would submit

12    to the Court that there is case law mostly

13    rising out of the Second Circuit, that

14    indicates that significant evidence of guilt is

15    something the Court should factor in when it is

16    making a detention determination, especially,

17    when the penalties faced are severe.

18         Here, it is a ten year statutory maximum

19    for each one of these counts.  This is not like

20    anything that Mr. Hudak has experienced in

21    state court.

22         There is cases out of the Second Circuit,

23    which is United States versus Williams, where

24    the Court noted that even if a ten year penalty

25    alone on a 922(g) was sufficient in terms of

UNITED STATES vs. MARIAN HUDAK    1:23CR231
Preliminary Examination & Detention 6/26/23

1    the strength of the evidence to weigh in favor

2    of detention because of the potential sentence

3    that was being faced on the significant

4    evidence.

5        I submit that the history and the

6    characteristics weigh in favor of detention

7    both with regards to safety of the community

8    and the risk of flight.

9        The defendant has dual citizenship.  He

10   has ties to another country in terms of flight.

11       In terms of danger to the community, he's

12   been arrested or convicted of repeated charges

13   over the past three years.  He's had multiple

14   probation violations.  He's had contempt orders

15   for violating no contact orders.  He attacked

16   Mr. Duarte when he was on probation already.

17       Again, held in contempt for the no contact

18   order with Mrs. Duarte.  He also has a prior

19   conviction for carrying a concealed weapon, and

20   drinking alcohol as well as DWI.

21       Finally, in terms of the nature and

22   seriousness, the danger to any person or

23   community upon his release, I think it is his

24   conduct over the past few years speaks for

25   itself.  He is a danger to the community

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23


Case 1:23-cr-00231-WO   Document 21   Filed 07/18/23   Page 121 of 126

1    because Mr. Smith -- or excuse me, J.S., there

2    is no evidence he had ever seen him before.

3    There was no evidence that there was any

4    instigating event.  J.S. was just a person

5    driving on the road who happened to be a black

6    man, and then it ended with him being chased to

7    his apartment building and having to call his

8    girlfriend because he was so afraid, to get his

9    firearm.  That's what these people are reduced

10   to.  The same thing for Mr. Duarte.

11        I would also contend he is a specific

12   danger to the witnesses in this particular

13   case, because he has violated the no contact

14   order, and that any conditions of release would

15   place him next door to the same people.  And

16   this isn't an issue of a civil contempt case in

17   state court.

18        Here, these people are witnesses in the

19   case that involves significant real penalties,

20   and that places them, I think, in additional

21   danger.

22        So nothing in the behavior indicates that

23   he's not going to violate orders of the Court

24   because he's already violated orders of the

25   court in the past.  This is the first time in

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

his years of menacing his community that he is
facing actual serious consequences, and he's
told us how he will react in such a situation.
That's Exhibit 11.  He said, "Don't threaten
what I love, unless you're prepared to meet
your end."

Now, appreciate his daughter's willingness
to serve as third-party custodian.  I think
this Court knows in the time that I've appeared
here, that I always am respectful and
appreciative of people who want to support
their family members, but the Court has already
identified what I view to be a significant
issue with her serving in that capacity, which
is that she appears to have a view of her
father that does not align with the evidence,
and she appears to be aggrieved on his behalf
to such extent that she called one of the
agents to accuse the agent of believing lies
and telling the agent she, "believed the
illegals."

And I will say in my ten years in
practicing in this District, I've never had a
proposed third-party custodian call one of the
law enforcement officers and make those types

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1    of accusations.  I have real concerns about her

2    ability to be unbiased and to report to this

3    Court any violations by her father, and that's

4    not even including the fact that she is a young

5    woman, and she is completely financially

6    dependent on him at this point in time.

7         So while I obviously respect her

8    willingness to serve, I don't think that the

9    conditions posed by probation, even with

10    Ms. Hudak as a third-party custodian, are

11    sufficient to insure the safety of the

12    community or to remove the risk of flight.

13         For those reasons, I would ask that this

14    Court detain him pending further proceedings.

15    And should this Court decide that release is

16    more appropriate, I would ask the Court to stay

17    that order pending an appeal to the District

18    Court.

19         **THE COURT:**  All right.  Let me ask both

20    sides to not send me a brief, but send me a

21    couple of cases with further research and find

22    out how these statutes have been interpreted.

23         Both of you may know the Fourth Circuit

24    conference is being held in Greensboro

25    beginning on Wednesday, and I plan to be

1    present for that, but if you'll send me those

2    cases, I can multitask and go to meetings and

3    decide certainly no later than Friday what I

4    plan to do in this case.

5            **MS. COSTNER:**  Yes, Your Honor.

6            **THE COURT:**  Thank you everybody.

7            (This matter was concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES vs. MARIAN HUDAK   1:23CR231
Preliminary Examination & Detention 6/26/23

1

2                    **C E R T I F I C A T E**

3

4          I, J. ALLEN, RPR, United States District Court

5    Reporter for the Middle District of North Carolina, DO

6    HEREBY CERTIFY:

7

8          That the foregoing is a transcript of the

9    proceedings had in the above-entitled matter, WHICH WAS

10   TAKEN FROM AN AUDIO RECORDING, AND TRANSCRIBED TO THE

11   BEST OF MY ABILITY.

12

13

14   July 19, 2023

15

16                    _____

17                         J. Allen, RPR
                           United States Court Reporter
18                         324 W. Market Street
                           Greensboro, NC  27401
19

20

21

22

23

24

25

UNITED STATES vs. MARIAN HUDAK    1:23CR231
Preliminary Examination & Detention 6/26/23