IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| UNITED STATES OF AMERICA, | ) |  |
|---|---|---|
| Plaintiff, | ) |  |
| v. | ) | 1:23CR231-1 |
| MARIAN HUDAK, | ) |  |
| Defendant. | ) |  |

**ORDER**

This matter is before the Court on Defendant's "Motion for Revocation of Mr. Hudak's Detention Order." (ECF No. 22.) Defendant's motion requests that this Court revoke the detention order entered by the Magistrate Judge on June 29, 2023, (ECF No. 18), and release Defendant pending trial, (ECF No. 22 at 1). The motion further requests a hearing on the matter. (ECF No. 22 at 1.) For the reasons set forth herein, Defendant's motion will be denied with respect to revocation of the detention order.

I. BACKGROUND

On June 20, 2023, the Government filed a Criminal Complaint against Defendant Marian Hudak alleging that he interfered with federally protected activities in violation of 18 U.S.C. § 245(b)(2)(B) and that he criminally interfered with the right to fair housing in violation of 42 U.S.C. § 3631(a). (*See* ECF No. 1 at 1.) Defendant was arrested, and at the initial appearance, the Government moved for detention pursuant to 18 U.S.C. § 3142(f)(2)(B) and § 3142(f)(1)(E), and a preliminary examination and detention hearing was scheduled.

Defendant appeared before the Magistrate Judge on June 26, 2023, for a preliminary examination and detention hearing. In preparation for the hearing, a United States Probation Officer prepared a Pretrial Services Report with information about Defendant's familial and residential history, employment history and financial resources, health, including mental health and substance abuse, and criminal history; the Pretrial Services Report also includes a recommendation to the Court regarding release or detention. (*See generally* ECF No. 12.) At the hearing, Defendant and the Government presented evidence, including witness testimony, and Defendant had an opportunity to object to the substance of the Pretrial Services Report.[1] (*See generally* ECF No. 13; ECF No. 21 at 64:14-20.) The Court after hearing the evidence, declined to rule at that time and took the matter under advisement. (ECF No. 18 at 1.)

After the detention hearing and on the same day, June 26, 2023, the grand jury indicted Defendant on two counts: Count One charges Defendant with violating 18 U.S.C. § 245(b)(2) alleging that Defendant did "by force and threat of force, willfully intimidate and interfere with, J.S., and attempt to intimidate and interfere with J.S., because of J.S.'s race and color, and because J.S. was enjoying a facility provided and administered by a State and its subdivision, that is, Concord Parkway South and Warren Coleman Boulevard. The offense included the use, attempted use, and threatened use of a dangerous weapon, that is, a firearm." (ECF No. 14 at 2.) Count Two charges Defendant with violating 42 U.S.C. § 3631(a) alleging that Defendant did "by force and the threat of force, willfully injure, intimidate, and interfere with J.D., and attempt to injure, intimidate and interfere with J.D., because of J.D.'s race and

---

[1] In addition to the objections to the Pretrial Services Report detailed herein, with respect to the probation violation detailed on page 6, Defendant denies that there was a stun gun in his residence on that occasion. (ECF Nos. 21 at 66:16-20; 12 at 6.)

2

Case 1:23-cr-00231-UA   Document 32   Filed 10/20/23   Page 2 of 17

national origin, and because J.D. was occupying a dwelling. The offense resulted in bodily injury to J.D." (*Id.* at 2–3.)

On June 29, 2023, the Magistrate Judge issued its ruling from the June 26 detention hearing, finding that probable cause supported the charges against Defendant in the Criminal Complaint and ordering that Defendant be detained pending disposition of this case based upon the Magistrate Judge's finding that clear and convincing evidence showed that no condition or combination of available conditions of release would reasonably assure the safety of other persons and the community, and further finding that a preponderance of evidence established that no conditions would ensure Defendant's presence in court. (ECF No. 18 at 1, 10.)

Defendant, on July 27, 2023, brought the instant motion arguing that Defendant is not a "serious risk of flight nor a danger to the community" and even if this Court found that he was, there are conditions or is a combination of conditions, such as those proposed in the Pretrial Services Report, "that will reasonably assure [Defendant]'s presence in court and/or the safety of any other person or the community." (ECF No. 22 at 2, 3–10). Defendant's motion does not challenge the Magistrate Judge's probable cause determination. (*See generally* ECF No. 22.) The Government in its Response argues that the evidence introduced at the detention hearing established that no conditions could reasonably assure the safety of the community and Defendant's appearance. (ECF No. 23 at 8–13.) Furthermore, the Government in its Response moved to supplement the record with additional evidence of danger to the community and risk of obstruction. (ECF No. 23 at 1, 6–7.)

3

This matter came on for hearing before this Court on October 6, 2023. At the hearing, both Parties provided supplemental evidence to the record evidence that had been presented on June 26, all of which the Court will now consider.

The central issue presented is whether the Court should revoke the Magistrate Judge's detention order as requested in the instant motion. Specifically, the Court must determine whether Defendant is a serious risk of flight or a danger to the community. If either or both of these questions are answered in the affirmative, then the Court must determine whether there are conditions or a combination of conditions that will reasonably assure Defendant's presence in court and the safety of any other person or the community.

## II.  STANDARD OF REVIEW

If a person is ordered detained by a magistrate judge pending trial, the person may file with the district court a motion for revocation or amendment of the order. 18 U.S.C. § 3145(b). The district court conducts a *de novo* review of the decision by the magistrate judge. *United States v. Clark*, 865 F.2d 1433, 1437 (4th Cir. 1989); *United States v. Williams*, 753 F.2d 329, 334 (4th Cir. 1985). "In doing so, the court may conduct an evidentiary hearing if it is necessary or desirable in carrying out the review." *United States v. Nash*, No. 4:21-CR-21-FL-2, 2021 WL 1998242, at *2 (E.D.N.C. May 19, 2021) (citing *Williams*, 753 F.2d at 333).

In determining whether there are conditions of release, pursuant to 18 U.S.C. § 3142(c), that will reasonably assure the appearance of the defendant as required and the safety of any other person and the community, the court must take into account the available information concerning:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . or involves a . . . firearm;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including –

4

>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release . . .; and
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g). If the court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," then it must order that the person be detained before trial. *Id.* § 3142(e)(1).

## III. DISCUSSION

In evaluating the issue of release or detention pending trial, the Court must consider the statutorily prescribed factors under 18 U.S.C. § 3142(g) as outlined in Section II above. Here, this Court's determination with respect to these factors is based on the record evidence presented at the detention hearing before the Magistrate Judge on June 26, 2023, and supplemented during the October 6, 2023, hearing before this Court.

### A. Record Evidence

#### 1. Testimony of FBI Agent Emily Franks

FBI Agent Emily Franks testified as follows as to the conduct later alleged in Counts One and Two of the Indictment: On October 13, 2022, J.S. was driving on Concord Parkway South and Defendant was driving in front of him, (ECF No. 21 at 6:3-6), however, eventually traffic caused J.S. to get close to Defendant's truck, (ECF No. 21 at 6:12-13). When J.S. and Defendant were driving next to each other, J.S. and Defendant made eye contact, and Defendant yelled the N word and "Come here, boy" to J.S. (ECF No. 21 at 6:14-16.) J.S.

5

noticed knives jammed into the open driver's side window of Defendant's car. (*Id.* at 6:19-21.) J.S. attempted to drive away but then noticed in his rearview mirror that Defendant was following him; Defendant then pulled around J.S.'s car, impeding his driving ability, and Defendant got out of the car, banged on J.S.'s window, and pointed his finger and said, "'Come here,' N word, and 'Hey, come here.'" (*Id.* at 7:6-12.) J.S. reached for a pistol that he had in his car, and Defendant got back into his truck; however, Defendant proceeded to follow J.S., who was driving to his apartment. (*Id.* at 7:13-21.)

As Defendant continued pursuing him, J.S. called his girlfriend, A.R., and told her to call the police and bring his rifle downstairs. (*Id.* at 7:24–8:3.) When J.S. arrived, A.R. brought him the rifle, and she got into J.S.'s car and drove down the parking lot and called the police. (*Id.* at 8:13-14, 10:10-14.) Defendant and an unidentified person in a black Cadillac positioned their vehicles to block both the entrance and the exit of the parking lot. (*Id.* at 8:18-25.) Video surveillance from the apartment complex captures the position of Defendant's vehicle in the parking lot.[2] (*Id.* at 8:21–9:3.) Both J.S. and A.R. reported that they saw Defendant with a handgun, that Defendant threatened to shoot them and said, "'I will kill you,' N word," "'I will shoot that black,' B word," and "I know where you live, and I will be back." (*Id.* at 9:23–10:9.) J.S. yelled to Defendant that he had called the police and Defendant left the apartment complex. (*Id.* at 10:15-19.)

The FBI interviewed K.E., who was a witness at the apartment complex when Defendant arrived; K.E. said that she saw Defendant pointing a small black handgun at J.S. and called the police. (*Id.* at 12:9-19.) K.E. told the 911 dispatcher that Defendant "[j]ust followed these black guys out here, and I seen guns and everything." (*Id.* at 12:20-22.)

---

[2] Defendant introduced this surveillance video at the hearing before this Court.

Shortly after Defendant left the apartment complex, officers from the Concord Police Department responded and conducted a traffic stop on Defendant's vehicle and performed a limited sweep of the vehicle, which did not yield any firearms. (ECF No. 21 at 11:4-14.)

With respect to Count Two and Defendant's conduct concerning his neighbors, on November 27, 2021, Mr. Duarte, Defendant's neighbor, was outside at around 11 p.m. about to drive his friend home when Defendant came out of his house and began yelling at Mr. Duarte about Mr. Duarte's car headlights waking up his daughter. (*Id.* at 14:8-13.) The two argued, during which Defendant yelled things like "You' F-ing 'Mexican alcoholics,'" and told Mr. Duarte to "go back to your country." (*Id.* at 14:14-17.) The argument continued, and Mr. Duarte said something like "if you want to do something, let's do it," and Defendant charged at Mr. Duarte and a physical altercation ensued and continued even after Mr. Duarte retrieved a shotgun out of the back of his car and pointed it at Defendant. (*Id.* at 14:18–15:3.) Defendant left after Mr. Duarte told him he needed to leave his yard. (*Id.* at 15:4-5.) After Defendant left, he continued to say, "Fucking Mexican," and "When I see you again, I'm going to run you off the road and I'm going to kill you," until he went home. (*Id.* at 15:15-18.) The Duartes' motion-activated Ring security camera captured two five-second clips of the encounter. (*Id.* at 15:6-14.)

In addition, Mr. Duarte's mother, Ms. Duarte, took out a no contact order against Defendant in state court and in the complaint alleged that on August 27, 2022, Defendant came towards the Duartes' dog with a bat and verbally attacked Ms. Duarte's 9- and 13-year-old daughters, and when Ms. Duarte came outside, Defendant called her, "A fucking Mexican, stupid fat ass bitch," and said that she should, "Go back to Mexico." (*Id.* at 15:20–16:6.) Defendant also recorded Ms. Duarte while she was waiting for the bus and said, "There she

7

is, that stupid fat ass Mexican bitch." (ECF No. 21 at 16:11-13.) Mr. Duarte was so concerned for his mother and his sisters' safety that he moved back home. (*Id.* at 16:15-18.)

Furthermore, Agent Franks testified to other instances demonstrating Defendant's racial bias. Agent Franks testified that on July 21, 2022, multiple people called the Concord Police Department to report that Defendant was broadcasting racial slurs over a loudspeaker in a Sam's Club parking lot, and when police arrived, Defendant was yelling "Fuck the black people," over a loudspeaker. (*Id.* at 16:19–17:5.) Agent Franks testified that a Concord police officer who lives in Defendant's neighborhood reported witnessing Defendant yelling at his Hispanic neighbor things like "Go back, you fucking Mexican, we don't want you dirty people." (*Id.* at 17:6-18.)

Agent Franks testified that while executing a search warrant at Defendant's residence on June 22, 2023, she and other law enforcement officers found a U.S. Secret Service badge that says, "special agent," ammunition, a copy of a motion and order to show cause for failure to comply with a no contact order for stalking or nonconsensual sexual conduct concerning Ms. Duarte dated March 6, 2023, along with a contempt order, a flag with a swastika and iron cross, a box containing tactical gear, including two ballistic vests, one with the placard saying, "Police," a collection of knives, bladed weapons, two additional law enforcement badges, what appeared to be a radar gun, edged weapons, what appeared to be a taser, a sword, a Velcro patch with a swastika, and a book or pamphlet depicting racial slurs. (*Id.* at 25:3–28:20.) Agent Franks testified that while executing a search of Defendant's truck, law enforcement officers found various weapons to include a wire-pull smoke grenade, ammunition, and a weapon-mounted light that could be mounted to a pistol and a rifle. (*Id.* at 28:23–30:6.)

8

2. <u>Testimony of FBI Special Agent Michael Stone</u>

In addition, during the October 6 hearing, the Government presented additional evidence, including the testimony of FBI Special Agent Michael Stone. Agent Stone testified that three days after the October 13, 2022, incident with J.S., Defendant attempted to buy a firearm but was denied. (Tr. 8:13-18.[3]) Agent Stone also testified concerning additional instances demonstrating Defendant's racial animus, including an instance involving J.C., the victim in Defendant's 2022 conviction for misdemeanor simple assault. (Tr. 39:23–40:4; ECF No. 12 at 5–6.) Agent Stone testified as follows: J.C. and a passenger in his vehicle were at a red light, Defendant was on the same roadway and saw them, and using his loudspeaker, Defendant made comments such as "Go back to your country." (Tr. 40:8-16.) When the light turned green, Defendant attempted to sideswipe J.C.'s vehicle, and when J.C. tried to get away from Defendant, Defendant was brake checking him and not allowing him to get around. (Tr. 40:17–41:2.) At the next red light, Defendant exited his vehicle and approached J.C.'s vehicle on the driver's side, stuck his head into J.C.'s open window, spat in J.C.'s face, put his hand in J.C.'s face and touched his face, and then punched J.C.'s vehicle with a closed fist, leaving a dent in J.C.'s car. (Tr. 41:8-15.) J.C. provided the FBI with digital evidence of the dent in the car. (Tr. 41:16-19.) J.C. reported that he saw some type of long gun, possibly a rifle or a shotgun, in Defendant's truck. (Tr. 41:22-24.) In addition, J.C. reported that the Hispanic community was fearful of Defendant. (Tr. 41:25–42:4.)

---

[3] Citations to "Tr." are to the Realtime Feed – Unedited/Uncertified Transcript for the October 6, 2023, hearing before this Court.

9

### B. Statutorily Prescribed Factors Weigh in Favor of Detention

With respect to the nature and circumstances of the alleged offenses, Defendant's alleged offense conduct involves threats to kill, the presence of dangerous weapons, and other unprovoked, forceful, and violent interference with J.S.'s civil rights, and unprovoked harassment and intimidation of his neighbors, in both instances motivated by the victims' race. The alleged conduct is serious. If convicted, Defendant could face a statutory maximum of 10 years for each offense. 18 U.S.C. § 245(b)(5); 42 U.S.C. § 3631(c).

Defendant takes issue with portions of the Government's evidence, specifically the evidence around whether he possessed a firearm on October 13, 2022. Defendant points to the fact that no firearm was found on Defendant or during the search of his vehicle, the victim and witnesses did not initially report that Defendant had a gun during their 911 calls, and the surveillance video from J.S.'s apartment complex does not show that Defendant had a firearm. (ECF No. 22 at 6–7; Tr. 58:21-25, 94:17-25.) The Government stands by its evidence that "three different witnesses saw [Defendant] brandishing a firearm." (ECF No. 23 at 9.)

While there does appear to be a question with respect to whether Defendant possessed a firearm during the events on October 13, 2022, this question does not substantially diminish the seriousness of Defendant's conduct as outlined by the Government's witnesses and charged in the Indictment. Moreover, the Government proffered when moving for detention, and the evidence establishes, that Defendant also possessed knives in his open driver's side window during the acts alleged in Count One.[4] The Government had a statutory basis to bring

---

[4] *See United States v. Sturgis*, 48 F.3d 784, 787 (4th Cir. 1995) ("Title 18 itself does not provide a general definition of 'dangerous weapon.' The United States Sentencing Guidelines, however, define a dangerous weapon as 'an instrument capable of inflicting death or serious bodily injury.' . . . The Supreme Court has eschewed a mechanical test of dangerousness in favor of a multi-factored inquiry which emphasizes the capacity of the instrument to instill fear or to inflict harm." (citations omitted)).

10

a motion for detention as the case involves possession of dangerous weapons as testified to by three witnesses, Defendant possessed a gun and further evidence that he also displayed knives in his truck. *See United States v. Watkins*, 940 F. 3d 152, 167 (2d Cir. 2019) ("§ 3142(f)(1)(E) warrants a conduct-specific inquiry in which the judicial officer may look beyond the elements of the charged offense to consider the actual conduct underlying the arrestee's charged offense.") The Court, after reviewing the record evidence, concludes that the nature and circumstances of the offenses charged are serious.

Further, the Court finds that the weight of the evidence is strong. Defendant argues that this Court should not consider the weight of the evidence too strongly because that would be almost assuming Defendant's guilt. (Tr. 94:3–5.) The Government on the other hand argues that the weight of the evidence is strong because in addition to the evidence discussed above, numerous pieces of evidence in the record also show Defendant's racial motive for the instant alleged conduct. (Tr. 87:10-18.) The Court agrees with the Government.

The record evidence shows that Defendant's alleged violent, provocative conduct including assaults and unprovoked threats to seriously harm and kill people of color is motivated by significant racial animus. As testified above, Defendant's continuous use of racially charged and derogatory language and his possession of racially degrading and offensive literature and other paraphernalia in his home provides strong evidence of racial animus. Moreover, the same 911 call that Defendant points to as circumstantial evidence that there was no firearm present during the October 13 events likewise evidences the substantial fear

---

*See also United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009) ("Inherently dangerous weapons, or dangerous weapons per se, are obviously dangerous objects such as guns, *knives*, and the like." (citations and quotation marks omitted) (emphasis added)).

11

and intimidation experienced by J.S. due to Defendant's unprovoked violent conduct. In light of the grand jury's finding of probable cause and record evidence in support of the allegations in the Indictment, the weight of the evidence remains strong and weighs decidedly in favor of detention.

With respect to Defendant's history and characteristics, Defendant was born in Slovakia; however, he has lived in the United States since 1992 and became a naturalized United States citizen in 2006. (ECF No. 12 at 1–2.) Defendant has lived in Concord, North Carolina, for seven years and has two children who reside in Concord, North Carolina. (*Id.* at 1–3.) Defendant is a dual citizen of Slovakia, has a Slovakian passport, and has family members who live in Slovakia, including his parents. (*Id.* at 1.)

In addition, Defendant was convicted in 2021 for misdemeanor driving while impaired and misdemeanor concealing a gun after or while consuming alcohol. (*Id.* at 4.) Defendant contends that the second charge was actually misdemeanor concealing a weapon, which he claims was a knife. (ECF No. 21 at 66:1-6.) Later in 2021, he was convicted[5] for a horn and warning device violation and using a red or blue light; an accompanying charge of misdemeanor impersonating law enforcement was dismissed, and Defendant was on probation for this conviction at the time of the November 2021 incident alleged in Count Two. (ECF No. 12 at 5.) In 2023, Defendant was convicted for misdemeanor simple assault, the victim was J.C., as detailed above, and Defendant was convicted for injury to personal property and disorderly conduct. (*Id.* at 5–6.) Thus, even though Defendant does not have felony convictions on his record, the record does demonstrate the same type of behavior for

---

[5] At the detention hearing before the Magistrate Judge, counsel for Defendant stated that Defendant did not remember the disposition of this charge, so he cannot agree that the Pretrial Services Report accurately states what happened with this charge. (ECF No. 21 at 66:7-15.)

12

which he is currently charged. In addition, Defendant was placed on probation for these offenses and has pending probation violations for possession of weapons and new criminal charges. (*Id.*) Also, Defendant was convicted for another disorderly conduct offense, criminal contempt, and misdemeanor stalking in 2023. (ECF No. 12 at 7.) Defendant was arrested in February 2023 for reckless driving to endanger, and this charge is still pending. (ECF No. 12 at 7.)

With respect to his health, Defendant reported that he was injured in a car accident in 2009 and as a result suffers from back and neck pain and receives monthly disability payments. (ECF No. 12 at 2, 4.) Defendant disclosed that he was addicted to oxycodone pills prescribed for his injuries. (*Id.* at 4.) Defendant also reported that he possibly suffers from post-traumatic stress disorder or bipolar disorder. (*Id.*; ECF No. 21 at 65:18-24.)

Here, Defendant's history and characteristics demonstrate a significant risk of danger to the community in light of his criminal history that includes assaultive conduct that appears to be consistent with the charged conduct in this case. This conduct poses a danger to those Defendant chooses to provoke, a danger to Defendant, and a danger to anyone nearby, as the record evidence reflects that people have been so intimidated by Defendant that they have fled from Defendant while on public roadways and defended themselves with violence including by brandishing firearms. The record evidence shows that Defendant continues to engage and pursue individuals despite their attempts to escape Defendant's violent provocation. Specifically, relevant here, after first encountering J.S. on the roadway, Defendant followed him to his apartment and threatened to kill him and his girlfriend and stated that he knows where they live. Moreover, three days after this incident, Defendant attempted to buy a firearm. The Court cannot overstate the inherent dangerousness of

13

Defendant randomly targeting people of color to violently provoke, intimidate, and pursue while possessing dangerous weapons, on public roadways and at their homes. In addition, court orders requiring certain conduct by Defendant have not provided effective deterrence, as the November 2021 incident with Mr. Duarte occurred while Defendant was on probation, and Defendant violated a state no contact order taken out by his neighbors who are also alleged victims in this case.

The nature and seriousness of the danger to any person or the community that would be posed by Defendant's release also weighs in favor of detention. Here, Defendant's history of threatening and assaulting people of color, including his next-door neighbors, would create a volatile and dangerous situation if Defendant were released. These same neighbors are also witnesses in this case; therefore, Defendant's pattern of behavior toward them also poses a serious risk of obstruction of justice. Given that the proposed third-party custodian, discussed below, lives with Defendant, if released, Defendant would return to the same residence where he engaged in the alleged criminal conduct and would pose danger to the community at large and specifically to his neighbors. Nor does the Court believe that the Duartes' new fence between their home and the Defendant's home is sufficient to mitigate these risks, as Defendant argues, in light of Defendant's history of aggressively pursuing these neighbors and total strangers.

Although dangerousness and obstruction are the primary risks, there is also a serious risk of flight due to the significant penalties Defendant is facing for these offenses, Defendant's history of not respecting court orders as evidenced by his violations of probation, violation of a state court no contact order, and conviction for criminal contempt, and due to Defendant's dual citizenship and strong family ties in Slovakia.

14

This Court is not confident that any conditions of release imposed would mitigate the risks discussed above due to Defendant's history of persisting in violent conduct despite court orders and violating state probation. Nor is the Court confident that if Defendant were released, he would follow the directions and instructions of the United States Probation Officer and allow the officer to supervise him, especially if the officer were to be a person of color.

### C. No Condition or Combination of Conditions Will Ensure Defendant's Appearance and the Safety of the Community

The United States Probation Office in its Pretrial Services Report determined that Defendant poses a risk of nonappearance and a risk of danger for several reasons, (ECF No. 12 at 7), nevertheless, the Report recommended a release plan that included, among other things, home incarceration, location monitoring, and a $10,000 unsecured bond, (*Id.* at 8).

Defendant is requesting that this Court adopt this release plan and proposed Defendant's 21-year-old daughter, Ingrid Hudak, as a third-party custodian. (ECF No. 21 at 66:21–67:4.) In addition, at the October 6 hearing Defendant's counsel also offered that the Court could set a bond secured by Defendant's property, (Tr. 91:18-21), which includes two homes in North Carolina each valued at more than $300,000, (ECF No. 12 at 3).

With respect to Defendant's daughter serving as a third-party custodian, the Court finds due to her age, the fact that Defendant is her father, and she has until recently been financially dependent on him, and the evidence that she perhaps shares the same views about people of color as her father, that she would not make a suitable third-party custodian. Ms. Hudak testified that she lives with Defendant, had not worked for several months[6], and she

---

[6] At the October 6 hearing, the Government stated that Ms. Hudak had gained full-time employment. (Tr. 90:3-4.)

described Defendant as a "very caring, loving, and respectable individual." (ECF No. 21 at 69:1-4, 72:3-13, 73:2-11.) Defendant initially reported to the Probation Officer that Ms. Hudak suffers with anxiety and is not dependable, (ECF No. 12 at 2), but Defendant later denied these statements, (ECF Nos. 21. at 66:21–67:2; 12 at 2). Ms. Hudak also admitted that she called FBI Agent Franks the evening before the detention hearing with the Magistrate Judge and left a voicemail telling Agent Franks that her father was being set up and accusing Agent Franks of believing "the lies of the illegal Mexicans." (ECF No. 21 at 79:19–80:3.) Finally, although Ms. Hudak testified that she would fulfill the obligations of a third-party custodian and report her father if he did not follow court conditions, (*id.* at 74:17–79:1), this Court is not at all confident that she would fulfill the role of third-party custodian satisfactorily.

With respect to the property bond, while it may serve to lessen the risk of flight to some degree, it would do nothing to address the level of danger to the community and the victims in this case.

No combination of available conditions would ensure the safety of the community or Defendant's appearance. The release conditions proposed by the Probation Officer would require regular visits by United States Probation Officers. However, in light of the record evidence, it would be irresponsible to require Probation Officers, many of whom are people of color, to supervise Defendant. Likewise, as described above, Defendant's proposed third-party custodian arrangement is insufficient to mitigate the serious risk of danger to the community as whole or the victims of Defendant's indicted conduct in this case. Further, given Defendant's history of disregarding court orders and violating state probation, neither the proposed release conditions, the proposed third-party custodial arrangement, nor a property bond would substantially mitigate the serious risks of danger and flight in this case.

Therefore, the Court finds that no condition or combination of available conditions would assure Defendant's presence in court and the safety of any other person or the community.

**CONCLUSION**

Accordingly, this Court, having conducted a *de novo* review, finds that clear and convincing evidence establishes that no condition or combination of available conditions of release would reasonably assure the safety of other persons and the community, and that by a preponderance of evidence, no conditions would ensure Defendant's presence in court. The Court concludes that Defendant must be detained pending trial pursuant to 18 U.S.C. § 3142(e)(1). Therefore, the Court declines to revoke the detention Order previously entered by the Magistrate Judge.

**ORDER**

**IT IS THEREFORE ORDERED** that the Motion for Revocation of Defendant's Detention Order, (ECF No. 22), is hereby **DENIED**.

This, the 20th day of October 2023.

/s/ Loretta C. Biggs
United States District Judge